UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     - against -                     16 CR 376 (RMB)

ABDULRAHMAN EL-BAHNASAWY,

          Defendant.
_____

Sentencing Memorandum on Behalf of Abdulrahman El-Bahnasawy

Andrew J. Frisch
Jason D. Wright
The Law Offices of Andrew J. Frisch
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 285-8000
afrisch@andrewfrisch.com

*Attorneys for Abdulrahman El-Bahnasawy*

Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

A.      Abdulrahman's Letter to the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

B.      The Medical Evaluations and Recommendations for Treatment  . . . . . . . . . . . . .  10

C.      Inadequate Options for Treatment in the Bureau of Prisons Favor a Sentence
        that Permits Abdulrahman's Return to Canada as Soon as is Reasonable  . . . . . .  16

D.      The Non-Violent Abdulrahman Thought of Violence Only as an
        Adolescent, in a Compromised Condition, and Only After Targeted Online . . . .  19

E.      The Ongoing Support of Family and Friends  . . . . . . . . . . . . . . . . . . . . . . . . .  23

F.      Mitigating Circumstances and the 3553 Factors Favor a Short
        Sentence on the Condition of Continuing Treatment in Canada . . . . . . . . . . . . .  26

Introduction

When Abdulrahman El-Bahnasawy was arrested upon exiting a car driven by his father on his family's arrival from Canada at a local hotel, he was not a newly-trained fighter from a terrorist camp, an entrenched enemy of western culture, or a longstanding acolyte of a jihadist.  Abdulrahman was a personable though socially-isolated eighteen year-old, struggling with his self-esteem and scheduled to continue professional consultations just three days later to promote his mental health and defeat his addictions.  Before Abdulrahman's arrest, his parents had relocated back and forth between Kuwait, Egypt and Canada precisely to help Abdulrahman find the best treatment -- well-intended moves that added to his sense of isolation.  In another time, Abdulrahman might well have persevered through adolescence and evolved without fanfare or continued to struggle unremarkably.  In our time, however, chatrooms filled the void, and Abdulrahman sought answers from real extremists in distant countries and undercover agents closer to home.

It is plain from Abdulraham's history, detailed herein, that he engaged in the conduct at issue precisely during a pause in treatment and prescribed medications.  Also plain is the path forward most likely to advance the interests of the community, even if that path appears blocked by our national preference for exclusion over care as a panacea for a range of human failings:  a course of intensive in-patient care to address Abdulrahman's documented issues.  Despite a national mindset that derides empathy, our current challenge is to impose a sentence for Abdulrahman that addresses legitimate community concerns without causing too much additional harm to him and the enlightened ideals that are our lodestar.

Basma El-Bahnasawy, Abdulrahman's twenty-one year old sister, has had perhaps

the clearest perspective on her younger brother's life. A student in Canada, Basma has prepared a video about her brother for the Court (Exhibit A), completely on her own initiative and in her own words, submitted herewith. Relying on contemporaneous photographs and videos of her brother, Basma documents her brother's adolescent struggles with his mental health, addictions and socialization that he was working to resolve with professionals before he turned to chatrooms. She describes her family's move from Kuwait to Canada in 2005 and to Egypt in 2012 for the very purpose of finding the best place for Abdulrahman to succeed. Basma notes the sad irony that Abdulrahman was arrested on May 21, 2016, just three days before a scheduled appointment with a new psychologist in Canada to explore promising therapeutic avenues. *See also* Exhibit H at 5 (Letter of Abdulrahman's father). As Basma demonstrates, Abdulrahman is not before the Court as if on an archeologist's dig for fossilized fragments from which theoretical inferences about the present might be drawn, but with real-time photographs, videos and medical records that indisputably reveal Abdulrahman to have been a child with challenges, especially vulnerable to the allure of cyberspace.

For these reasons, Abdulrahman's case is unique and not easily plugged into a sentencing template. Before Abdulrahman's conduct, he received professional care, but none that successfully treated his issues, and all of which were undermined by sudden family relocations that made constancy impossible and socialization more illusive. Before Abdulrahman's arrest, the Canadian government knew, and presumably shared with the United States, that he had been treated at Canada's Centre for Addiction and Mental Health ("CAMH"). Exhibit X. Our national policy that trumpets prosecution over interdiction does not foreclose a sentencing that acknowledges and reflects the indisputable role played by Abdulrahman's mental

illness and addictions.

A.    Abdulrahman's Letter to the Court

If Basma's video provides an especially reliable narrative of Abdulrahman's young life, his letter to the Court (Exhibit C) is especially revealing.  Abdulraham provides a plainly-heartfelt account of his life, his perspective on the illnesses and addictions that devoured his adolesence and led him to online extremists, his ultimate embrace of Islam as a beacon for peace and compassion, and his complete disavowal of violence and regret for his conduct.

Abdulraham recalls himself as a "shy and quiet 5 year old, not knowing anything about the world," who faced the "bitter reality" of prejudice upon starting school when his Kuwaiti classmates heard him speak and realized he was Egyptian:

> The students thought "low" or different of me because I was from Egypt while they were all from Kuwait.  Egyptians are known to be poor and basically a joke to Kuwaiti's . . . I remember inviting everyone to my birthday party, and have no one show up, or the kids reactions when they first heard my accent and realized I was different from them.

Abdulrhaman describes "adapt[ing] to being lower and of less worth than everyone else . . . and it quickly became normal."  Exhibit C at 1-2.

Abdulrahman's life improved when his family relocated to Canada, where he made frends easily, providing "a great feeling."  His mother, however, "began to be strict and not let us go out as much . . . with strong restrictions on playing outside," fearing for her son's safety and bad influences.  When she lifted her restrictions by the time Abdulrahman was about thirteen, he became interested in marijuana and ultimately was noticeably intoxicated.  When Abdulrahman refused to tell his parents the source of the marijuana, they took him to a police station, where officers explained that they could not force the information from Abdulrahman,

and that adolescent experimentation with marijuana was not unusual.  Exhibit C at 4-5.

Abdulrahman recalls his parents becoming "enraged."  They did not allow Abdulrahman to leave home even for school, and confiscated his cellphone, computer and all his electronics.  They advised Abdulrahman and Basma that the family would leave soon for a vacation to visit Egypt, but, as Abdulrahman describes it, "it was a trap to Kuwait:"

> In Egypt, they informed me and my sister that we were moving to Kuwait, and we were then forced to go.  I guess my parents worried that if they told us of the plan (of moving) in Canada, we just wouldn't go.  But in Egypt, we were trapped and forced to go, because we didn't know anything or anyone in Egypt, and weren't old enough to travel alone to Canada . . . I couldn't say bye to any of my friends, or pack my stuff up, we went straight to Kuwait.

Exhibit C at 5.  Abdulrahman's unpleasant memories of his earlier time in Kuwait became his new reality, as new Kuwaiti schoolmates realized he was Egyptian and taunted and insulted him.  He became depressed and determined to find marijuana, which he began to smoke daily.  When Abdulrahman's parents realized that he was again smoking marijuana, they again confiscated his electronics, and locked the front door of the house, requiring a key to leave.  They walked him everyday to his school's front door, which gave his schoolmates more gist for ridicule.  Exhibit C at 6-7.

When he was about fifteen, Abdulrahman began to doubt Islam and stopped identifying as Muslim and became more intent on getting high.  Because marijuana was often difficult to find, he researched and experimented with other intoxicants, including cough syrups containing diphenhydramine or dextromethorphan, codeine, K2 and ultimately butane inhalants, a cheaper and less-detectable option, to which he became severely addicted:

> I put a rag over an air freshener (to filter the soap in it) and inhaled the air that came out.  To my surprise I felt a nice euphoric feeling, and my body started to

> buzz and get numb.  I couldn't believe it and felt like the happiest person in the
> world. The high quickly ended though (in 2 minutes).  So I huffed again, and
> again, and again, The more I huffed, the more psychedelic I began to feel.   I
> would hear ringing noises and get a nice feeling in my body.

Exhibit C at 10.  For four or five months, Abdulrahman used inhalants everyday.  When

intoxicated, Abdulrahman began hearing a voice talking to him through a fan, with whom

Abdulrahman conversed and "became one of my only friends."  He experienced other

hallucinations, including being flushed down the toilet, objects talking to him, words in music

morphing into other words, and people coming out of walls.  Abdulrahman also began to use and

became addicted to heroin (using it daily).  Exhibit C at 10-11.  A precursor to his later conduct,

Abdulrahman turned to the Internet to find and sometimes sell drugs.

When Abdulrahman's parents learned of his new addictions and hallucinations,

they admitted him to a psychiatric hospital, Exhibit C at 11-12.

Exhibit C at 12.

Abdulrahman was released from the hospital after about forty days, but managed

to avert his parents' restrictions at home and abuse inhalants again, and was immediately

returned to the hospital for a month.  Exhibit C at 13.  Thereafter, Abdulraham's parents returned

with him to Canada for out-patient treatment at CAMH, but he was forced into in-patient

treatment upon disclosing multiple attempts to kill himself:

> I felt like there was no reason to live, and being asleep (dead) would be much better than living the life I was living, where I had no purpose and the only thing I lived for were drugs.

Exhibit C at 14.  The presence of similarly-situated people of Abdulrahman's age at the facility made the experience socially satisfying, but not therepeutically productive.  After about six weeks, Abdulrahman's parents returned with him to Kuwait, where he was readmitted for pyschiatric treatment.  After Abdulrahman found and used hashish in the facility, his parents told him, as they had once before, to prepare for a vacation in Egypt, but he learned upon arrival that he would be placed in an Egyptian detoxication and rehabilitation facility (the Alriyada Center), where he stayed for eight months.  Exhibit C at 15.



Exhibit C at 16-17.

After Abdulrahman's release from the Egyptian facility, and a short vacation with his family in Europe, he returned to Canada.  Abdulrahman "was 17 now and technically didn't know anyone there anymore, except a few people who still remembered" him.  Though Abdulrahman did not identify as Muslim, his parents forced him to enroll in an Islamic school. Exhibit C at 17.  As confirmed by Abdulrahman and his parents, he was not in treatment during this period, and not taking any prescribed medication (despite his mother's occasional attempts to grind medication and put it in his food).  He stopped going to school and became even more

isolated, spending hours alone in his room. It was also during this period that Abdulrahman

encountered extremists online and ultimately undercover federal agents.

Since Abdulrahman's arrest in May 2016, as he recounts in his letter to the Court,

he has worked through difficult issues, including the abuse and taunting of a guard, his use of

illegal narcotics as well as prescribed medication, and his own acting out in prison.  He has had

the opportunity in custody, sometimes in the isolation of special housing and sometimes in

population, to reflect on his conduct, his life and the relevance of his spiritual beliefs to both.

During this time in custody, he turned nineteen and then twenty.

Abdulrahman earned his GED at the MCC and expects to be soon tutoring other

inmates.  Exhibit C at 22.  He has met regularly with an Imam and a social worker, as well as

many professionals, some of whom prepared evaluations, discussed herein, to aid the Court.  His

parents and sister have visited him regularly, and his lawyers have attempted to serve him not

just as advocates, but as counselors in the broadest sense of that word.  Abdulrahman today is not

the same as when he returned to Canada from in-patient care at the Egyptian psychiatric facility:

> [S]ince I've been arrested I went through many ups and downs with my ideas and
> thoughts, having back and forths and at times being very confused at what I was
> doing.  I know the worst of these times was when I was in isolation.

Exhibit C at 20.

> After a long transition in my thoughts now, for the months and months I've been
> here, from the hard times in the S.H.U. until the time in general population, I can
> finally say that I do not want to take the path of violence or war anymore, and that
> I want to live a good life away from problems, as I've hardly seen other than them
> in my life.  There are many issues in this world but I don't want to lose my life or
> freedom to try fixing them, and I definitely do not want to resort to violence or
> harm to fix them.  I sincerely apologize for my behavior and I only ask for a
> second chance.  I want to experience life away from drugs and away from war and
> violence.  I want a stable life and I want to stop having extreme turns that keep

getting me in trouble, like my turn towards drugs or my turn towards jihad.

Exhibit C at 23.

Abdulrahman recalls a day before his arrest when he momentarily forgot a code he needed to reach the undercover agent and other online contacts.  He expresses regret that he did not seize on his initial thought that "it was a message from God to just forget about the plot and do something else with my life."  Exhibit C at 22.  Other times he wonders where he would be if the undercover or anyone else aware of his plotting might have encouraged him to find a more productive way to remedy injustice.  Exhibit C at 22-23.  Even so, it is difficult to fathom that Abdulrahman, with no history of any violence whatsoever, would have followed through on his plot absent encouragement online.

Abdulraham's letter makes plain that he remains a twenty year-old, evolving and maturing.  As Abdulrahman explains, he genuinely misses his family and the family trips he took with them.  Whatever his sentence, he knows that Basma "will always be there when I get out (by Gods will) to help me back into the world."  Exhibit C at 23.

B.    The Medical Evaluations and Recommendations for Treatment

1.  A Summary of Abdulrahman's Pre- and Post-Arrest Treatment

For the Court's convenience, a summarized history of Abdulrahman's care is set forth below, based mostly on review of available medical records by Robert A. Beattey, J.D., Ph.D, a clinical and forensic psychologist, who assisted the below-described neuropyschological evaluation by Ali Khadivi, Ph.D (whose report, Exhibit E, contains Dr. Beattey's summary and to which Dr. Beattey's *curriculum vitae* is attached):





2. <u>The Post-Arrest Evaluations and Recommendations</u>

The medical professionals who have evaluated Abdulrahman since his arrest are in general harmony about his condition and the way forward.  Of the three principal professionals who evaluated Abdulrahman, ██████████████████████████████ ████████████ Katherine A. Porterfield, Ph.D, Clinical Instructor, Department of Psychiatry, NYU Langone Health (report and *curriculum vitae* at Exhibit D). ███████████████████████ █████████████████████████████████████ █████████████████████████████████████ ████████████████████████████████████ ███████████████████████████

Ali Khadivi, Ph.D, Associate Chair for Clinical Care, Evaluation and Research, Department of Psychiatry, Bronx-Lebanon Medical Center (report and *curriculum vitae* at

Exhibit E, ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████.

     John Mariani, M.D., Associate Professor of Clinical Psychiatry at the College of Physicians and Surgeons of Columbia University, and a Research Psychiatrist  at the New York State Psychiatric Institute (report and *curriculum vitae* at Exhibit F), ███████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████







Abdulrahman has plainly evolved during his custody.  He has taken responsibility for his actions and disavowed violence in favor of a view of Islam as a peaceful theology.  The most encouraging sign is Abdulrahman's complete understanding that he continues to need help and wants to get better and lead a normal life.

C.     Inadequate Options for Treatment in the Bureau of Prisons Favor a Sentence
       <u>that Permits Abdulrahman's Return to Canada as Soon as is Reasonable</u>

Among the factors that the Court must consider in imposing a sentence no greater than necessary to achieve the statutorily-described goals of sentencing is to provide the defendant with needed medical care.  18 U.S.C. §3553(a)(2)(D).  The medical care needed to promote Abdulrahman's medical health and thereby advance his interests and those of the community will not be provided within the Bureau of Prisons, which in fact may undermine recovery.

The Hippocratic Oath contains an approximation of the medical mandate *primum non nocere*, "first, do no harm."  *See* Hippocratic Corpus, "Epidemics," ("The physician must . . .  have two special objects in view with regard to disease, namely, to do good or to do no harm"), book I, sect. 11.  Even with the best intentions, the government cannot easily abide by

that mandate:

> [M]edical care is delivered in the context of informed choices, selectivity, and securing of patients satisfaction.  On the other hand, prisons are authoritative institutions, organized as hierarchies that tend to focus on the expedient, time-honored, standardized solutions to problems.  Prisons, furthermore, are defined by the imperatives of custody and control.  Following the dictates of public safety and security, corrections officials concern themselves rather than with 'allowing no harm,' with neutralizing threat, containment and, on occasion, punishment . . . In short, providing care in prison settings poses significant challenges to ethical and effective medical practice.

*Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, United States Department of Justice, National Institute of Corrections (February 2004), at 48.

An expert in designations of defendants within the Bureau of Prisons ("BOP"), attorney Todd Bussert, has provided a declaration in aid of Abdulrahman's sentencing in which he opines on the likely placement and type of care for which Abdulrahman would qualify within BOP.  Mr. Bussert notes that ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ From this MCC conclusion and Mr. Bussert's review of the Presentence Report and medical evaluations in this case, he provides the following opinions:



• "Mr. El Bahnasawy will not receive intensive treatment for his documented substance abuse issues;"

Exhibit G at 13.

• "The BOP will not permit outside mental health providers to treat him, as it appears has occurred during the pendency of this case;" and

Exhibit G at 12.

• despite efforts of the Obama Administration to curtail and terminate use of contract facilities to house non-citizens because they "incurred more safety and security incidents per capita than comparable BOP institutions," the Trump Administration has stopped or reversed those efforts, making it "possible, if not probable, that the BOP may designate Mr. El Bahnasawy to a contract facility, as opposed to a standard, BOP-managed FCI."

Exhibit G at 9-10.

The unfortunate reality of American correctional healthcare is that Abdulrahman is unlikely to receive anywhere near the level of services within BOP that he would in the community. ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████████

The correctional environment is by definition antithetical to the particular treatment Abdulrahman needs, and whatever services he may obtain may as likely cause harm as benefit. The best though limited option within BOP may be FCI Butner, for which Mr. Bussert proposes language of judicial recommendation.  Exhibit G at 13.  If the Court concludes that the nature of the crime and interests in general deterrence disfavor a sentence of time served so Abdulrahman can return to Canada for proper treatment, it should impose a short sentence that will enable him to be treated as medically necessary as soon as is reasonable.

D.     The Non-Violent Abdulrahman Thought of Violence Only as an
       Adolescent, in a Compromised Condition, and Only After Targeted Online

        It is hard to conclude that the non-violent teenaged Abdulrahman, fearful even of

contact sports [*see* Exhibit H at 2], would have resolved to hurt anyone without the

encouragement of others, including the undercover agent whom he perceived as "someone he

looked up to" and a leader.  Exhibit C at 22.   Even the government allowed Abdulrahman's

father to cross the Canadian-American border with Abdulrahman in tow and drive eight hours

from Buffalo to New Jersey without stopping or arresting him, an inaction suggesting at least

some governmental belief that Abdulrahman was by himself not a real threat.  Agents found no

contraband in Abdulrahman's father's car or his family's home in Canada.  The government's

evidence shows that Abdulrahman could not and would not have acted alone or without active

encouragement, a fact that may not nullify guilt, but is relevant to the type of sentence to impose.

        The Supreme Court recognizes that the most important distinction between

adolescents and adults is the ability to grow: "[t]he relevance of youth as a mitigating factor

derives from the fact that the signature qualities of youth are transient; as individuals mature, the

impetuousness and recklessness that may dominate in younger years can subside."  *Roper v.

Simmons*, 543 U.S. 551, 570 (2005)(*quoting Johnson v. Texas*, 509 U.S. 350, 368 (1993)).

As Abdulrahman had recently turned eighteen when arrested, the Supreme Court's recognition of

three factors reducing adolescents' culpability in the context of death and life-without-parole

sentences helps inform considerations here: (1) a lack of maturity and underdeveloped sense of

responsibility often resulting in impetuous decision-making; (2) greater susceptibility to negative

influence through peer pressure; and (3) more transitory character than that of an adult.  *Roper*,

543 at 569-70.  Developmental psychologists agree with the Supreme Court that differences

between adult and adolescent decision-making should translate into differences in sentencing.

*See, e.g.*, Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799, 839-40

(2003) ("*Blaming Youth*").

       Social psychologist Erik Erikson coined the term "identity crisis" in his landmark

work "Childhood and Society," which explained the social significance of childhood and his

conclusion that young people face identity confusion from the age of twelve to eighteen as they

try to become adults.  Erikson, Erik, *Childhood and Society*, W.W. Norton, 1950, 1963, 1985.

"For immigrant and minority youth, part of this development of identity involves an intensified

exploration of the meaning of one's ethnicity and the special task to negotiate a balance between

two value systems: that of their own group and that of the majority."  Kapteijns, Lidwien and

Arman, Abukar, *Educating Immigrant Youth in the United States: An Exploration of the Somali

Case, Bildhaan: An International Journal of Somali Studies*: Vol. 4, Article 6. (2008) p. 20.

Such an identity crisis leaves the young person vulnerable to jihadists who offer them an identity

and a sense of belonging and purpose.

       Two former public defenders, one from the Eastern District of New York and one

from San Diego who both now practice in Minnesota, have authored a comprehensive article on

the intersection between adolescent development and vulnerability to Islamic State recruitment.

They note that "[d]ecades of research by developmental psychologists and neuroscientists on the

development of the adolescent brain,[1] adopted by the Supreme Court in a series of cases

---

     [1]*See e.g.* Barry C. Feld et. al.*, Adolescent Competence and Culpability: Implications of
Neuroscience for Juvenile Justice Administration*, in Stephen Morse & Adina Roskies, eds., A
PRIMER ON CRIMINAL LAW AND NEUROSCIENCE (New York: Oxford University Press,

beginning in 2005, have highlighted adolescents' impulsivity, vulnerability to peer pressure, and transient identity."  JaneAnne Murray and Jean Brandl, *"Terrorism is Different: Experts and Terrorism Representations,"* Minn. Assn. of Cr. Defense Attys, Winter 2017 at 8-9[2] (citing *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (1012); *Graham v. Florida*, 560 U.S. 48, 76 (2010); *Roper,* 543 U.S. at 569.  This "immaturity gap" does not close until adolescents reach their mid-twenties.  ISIL capitalizes on these traits in adolescent and young adult recruits.  Murray and Brandl, *Id.* At 9.

Meanwhile, "[r]isk-taking declines between adolescence and adulthood because of changes in the brain's cognitive control system, which improve individuals' capacity for self-regulation and occur gradually over the course of adolescence and young adulthood."  *Id.* at 9-10. Consistent with Dr. Mariani's observation that Abdulrahman was "an adolescent whose cognitive functioning will continue to develop into his mid-twenties," Ms. Murray and Ms. Brandl note that "the increase in reward-seeking, which occurs early and is relatively abrupt, and the increase in self-regulatory compliance, which occurs gradually . . . is not complete until the mid-20s."  *Id.* at 10 (citing Margo Gardner & Laurence Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study*, 41 Developmental Psychol. 626, 626-630 (2005).

Abdulrahman was vulnerable because of his age and status as an ethnic outsider, but was even more vulnerable because he indisputably immersed himself in an online reality

---

2013), at 183 ("*Adolescent Culpability*"); David O. Brink, *Immaturity, Normative Competence, and Juvenile Transfer: How (Not) to Punish Minors for Major Crimes*, 82 Tex. L. Rev. 1555 (2004); *Blaming Youth at 811-19.*

[2]  Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3078903.

between the end of his treatment at Egypt's Alriyada Center Hospital in 2015 and his

appointment with a new psychologist in 2016, scheduled for three days after his arrest. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███   During this period, Abdulrahman's mother obtained and grinded medication so that

Abdulrahman would take it with his food, but he would often detect and reject it.   Exhibit H at

5-6; Exhibit I at 6.

Abdulrahman's vulnerability is indisputable from the historical record, but

perhaps also from proceedings before the Court.  After months of equivocation and rejection of

his parents' entreaties that he change counsel, Abdulrahman unequivocally asked that the Court

permit a substitution of counsel and underscored his request with clear and unequivocal answers

to the Court's extensive questioning.  Transcript of Nov. 7, 2017 at 30-45.  Apart from

Abdulrahman's answers to the Court's questions, he repeatedly assured prospective new counsel

that his desire for the substitution was unequivocal.  Transcript at 4-5.  The Court declined to

grant Abdulraham's motion in full, however, even with the Federal Defender's repeated requests

to be relieved.  While we continue respectfully to disagree with the Court's ruling, the Court's

fashioning of a hybrid representation and its stated rationale therefor is some evidence of the

Court's view that Abdulrahman was too immature or vulnerable to pressure to be fully

accommodated, or that delays in his individuation contributed to lack of clarity in his decision-

making.  Those same issues underscore the extent of his culpability for the crime to which he

pled guilty and the wisdom of imposing a short period of confinement so he can immerse himself

in proper treatment in Canada.

F.     The Ongoing Support of Family and Friends

████████████████████████████████████████████████████████

████████████████████████████████████   Apart from Basma's video, her note to the

Court, entitled "The Future," observes that "[f]amily is the most important thing in the world,"

and "isolation is the greatest disease to an individual: impacting a family, community and

nation."  Exhibit B at 1.

Basma addresses three ingredients in her plan to help her brother: (1) mental

health care, (2) re-integration; and (3) religious counseling.  As for *mental health care*, Basma

advises the Court that she "will always ensure my brother meets with a psychiatrist to express

issues he is facing and how to tackle them."  She reports that she and her parents have been

participating in family counseling and mental health groups, which has aided them in identifying

resources and connecting with mental health professionals.  As for *re-integration*, Basma notes

that family is critical to Abdulrahman's success, and so she has made it a priority to visit her

brother every two weeks, "will always make time for him," and encourages her brother to

"understand our purpose as youth through conversations and constructing a positive future plan."

As for *religious counseling*, she hopes to help Abdulrahman "find a positive religious influence

through identifying his interests," and help him find communities which empower him as a

Muslim and help him find his purpose."  Exhibit B at 1.

Abdulrahman's parents are participating with Basma in family counseling so they

can assist Abdulrahman upon his release.  Exhibit H at 7.  They pledge their commitment to their

son and to abide whatever conditions for treatment might be imposed:  "We are ready for any

orders or requests toward my son to make sure he is good person like put us as a guarantor for

him or any other things which your honor find it will be useful." Exhibit H at 8, 9.  As they fairly observe, the landscape has changed since their pre-arrest attempts to help their son, and not just because of Abdulrahman's efforts since arrest: his prospective champions now include an extended community, which "wants to help, everybody feel responsibility to support."  Exhibit H at 8.

        Members of the extended community awaiting to help with Abdulrahman's recovery include Sandy Amodio, a family counselor with whom the parents and Basma have been meeting. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████  Mohamed Abdallah Eid, Abdulrahman's close friend growing up and now an undergraduate student at the University of Toronto, writes that "it would be an honor to help an old friend overcome an obstacle in their life and have a blessed future even if it means any sacrifices would have to be done on my behalf."  Exhibit N.   Hesham Youssef, a banker in Toronto and manager of an Islamic community centre, who has worked with the Royal Canadian Mounted Police to discuss issues of radicalization of youth, also offers to help:

> We will actively monitor him and do whatever it takes to assist his family in providing them respite to help deal with this development in their life.  We will do whatever it takes to welcome him back and are eager in seeing him and his family be able to thrive again and look past this unfortunate event.

Exhibit W.

        Many of the correspondents express their belief that Abdulrahman engaged in his conduct out of loneliness.  As expressed by Mark Duran, who was an inpatient with

Abdulrahman at CAMH, "[t]he problem in Abdul's case is that he didn't have any other 'friends.'" Exhibit M.  Mr. Duran told a reporter that, "I think he simply found people who truly accepted him.  He liked the feeling of being somebody one can depend on."[3]  Abdulrahman's aunt, retired pediatrician Iman Hamida, recalls how "he was rushed between hospitals and rehab centres.  While other children his age were enjoying their childhood, Abdulrahman was struggling and striving to change and save himself from the grips of his destructive new habits." Exhibit P.

Ebtihal Muhammad A. Khalifa, Abdulrahman's aunt, recalls how "he grew detached from everyone, as though there was something hurting him deep inside that he couldn't tell anyone about."  Exhibit Q.  Nasayim Mostafa, an older cousin, asks the Court to

> look at him as the real him, the him before the drug addiction, the him before the mental illness and I'm sure that you will see what we all know him for a smart funny kind passionate young person with so many potentials and so many dreams for the future. Your honor did you know that the "Rahman" in Abdulrahman's name means the most merciful.

Exhibit T.

G.     Mitigating circumstances and the 3553 Factors Favor a Short
       <u>Sentence on the Condition of Continuing Treatment in Canada</u>

The Court imposes sentence for assisting terrorists in the same way that it sentences for other crimes:  by imposing a sentence sufficient, but not greater than necessary to comply with the factors of Section 3553(a)(2) [*United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013)], by treating the Sentencing Guidelines as advisory and not presumptively reasonable on the facts of any particular case [*see Gall v. United States*, 552 U.S. 38, 50 (2007)], and by

---

[3] *Available at* https://www.thestar.com/news/world/2017/10/10/mississauga-teen-linked
-to-nyc-terror-plot-suffered-from-drug-addiction-mental-health-issues-documents.html.

recognizing that some guidelines "exemplify the Commission's exercise of its characteristic institutional role," while others do not.  *Kimbrough v. United States*, 128 S. Ct. 558, 575 (2007).

The astronomical Guidelines range in this case derives in large part from the application of U.S.S.G. §3A1.4, which works a 12-level increase in the base offense level and raises the criminal history category of Abdulrahman, an eighteen year-old first offender, from I to VI, the category reserved for career criminals with extremely high risks of recidivism.  No judicial deference is owed to that section, which was promulgated in response to a congressional and political directive without empirical analysis of policy considerations, and which fails to account for the nature and circumstances of the case and the history and characteristics of the defendant.

A recent analysis conducted by George Washington University's Program on Extremism identifies 157 defendants (as of February 1, 2018) who have been charged with offenses related to the Islamic State since the first arrests in 2014.[4]  While the circumstances of each of the 157 cases are not readily available (and are all necessarily fact-specific), the average age of those 157 defendants was 28, and the average sentence was 13.6 years.  That average sentence necessarily accounts for mitigating and aggravating circumstances found to be present in the underlying cases, but it nonetheless provides a helpful benchmark as the Court considers the mitigating circumstances in this case:

  • Abdulrahman's youth, mental illness and addictions;

  • His resort to an online community while socially isolated and during a pause in psychological and addiction treatment and prescribed medications;

---

[4]  Available at https://extremism.gwu.edu/gw-extremism-tracker.

• His acceptance of responsibility, embrace of Islam as a peaceful theology and disavowal of violence ███████████████████████████████████████

• His understanding of the need for continued treatment and a desire to get better;

• The multiple new authority figures whom he has met since his arrest, including many medical professionals, a social worker, his lawyers and an Imam, all of whom have helped relieve Abdulrahman's isolation and adjust his worldview by their presence, support and counsel;

• The absence of any actual harm to anyone and the unlikelihood that Abdulrahman would truly have followed through to hurt anyone absent encouragement (the longest sentences are reserved for defendants who get much closer to doing physical violence and who do not accept responsibility for their actions, *see., e.g, United States v. Mohamed Osman Mohamud*, 10 CR 475 (D. Ore) (360 months for defendant convicted after trial of taking the last step - dialing a number to detonate a bomb);

• The willingness and readiness of Abdulrahman's parents and so many family and friends to assist with his recovery; and

• Basma's dedication to her beloved younger brother's well-being. ███████████████████████████████████████████████

For these reasons, a sentence no greater than necessary to comply with Section 3553(a) should be as short as reasonable under all the circumstances and perhaps no more than the years until the onset of Abdulrahman's mid-twenties when his cognitive development will be complete.  A sentence reflecting the seriousness of the offense [Section 3553(a)(2)(A)] and to afford general deterrence [Section 3553(a)(2)(B)] are substantially outweighed by the

unavailability of needed medical care upon designation by BOP [Section 3553(a)(2)(D)], the low

risk of recidivism [Section 3553(a)(2)(C)], and the nature and circumstances of Abdulrahman

and his history and characteristics.  Section 3553(a)(1).

Dated: March 1, 2018

                                          Respectfully submitted,

                                          //s//

                                          Andrew J. Frisch

                                          Jason D. Wright

                                          The Law Offices of Andrew J. Frisch

                                          40 Fulton Street, 23rd Floor

                                          New York, New York 10038

                                          (212) 285-8000

                                          afrisch@andrewfrisch.com

                                          *Attorneys for Abdulrahman El-Bahnasawy*