IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Docket No. 16-CR-00376-RMB |
| ) | |
| ABDULRAHMAN EL BAHNASAWY ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DECLARATION OF TODD A. BUSSERT, ESQUIRE**

TODD BUSSERT, hereby deposes and says that the following is true:

1. I am a member in good standing of the Bars of Maryland, the District of Columbia and Connecticut. I am also a member in good standing of the United States Courts of Appeals for the First, the Second, the Third, the Sixth and the District of Columbia Circuits, and of the United States District Courts for the Districts of Connecticut, of the District of Columbia and of Maryland, for the Southern, Eastern and Northern Districts of New York, and for the Northern District of Florida.

2. I am the former Associate Director of Client Services of the National Center on Institutions and Alternatives, a 501(c)(3) organization that provides individualized assistance to those within human service and correctional systems. I entered private practice in May 2001. Since in or about Fall 1996, I have regularly represented and assisted in the representation of individuals with regard to issues involving the federal Bureau of Prisons (BOP), including individuals facing designation to or custody within the BOP.

1

3. I am the past vice-chair of the U.S. Sentencing Commission's Practitioners' Advisory Group as well as the former co-chair of both the American Bar Association—Criminal Justice Section's Corrections and Sentencing Committee and the National Association of Criminal Defense Lawyers' (NACDL) Corrections Committee. I am the former editor of the "Grid & Bear It" column for NACDL's THE CHAMPION magazine.

4. I write regarding BOP-related matters. As examples, I wrote the *Bureau of Prisons Issues* chapter for the 2016 edition of the Federal Public and Community Defenders' DEFENDING A FEDERAL CRIMINAL CASE treatise. I co-wrote *How Federal Prisoners Are Placed: Shedding Light on the BOP's Inmate Classification and Designation Process*, CRIMINAL JUSTICE (ABA Spring 2016). I was a contributing author to the 2012-2014 edition and to the Revision 3 edition of ALAN ELLIS'S FEDERAL PRISON GUIDEBOOK. I am the principal author of, *inter alia*, *New Time Limits on Federal Halfway Houses: A shift in correctional policy*, CRIMINAL JUSTICE (ABA Spring 2006) and *BOP Update: More Beds, Less Rehabilitation*, THE CHAMPION (NACDL March 2005). I wrote *Minimum Security* in the ENCYCLOPEDIA OF PRISONS AND CORRECTIONAL FACILITIES (Sage 2005, Mary Bosworth, ed.).

5. I give BOP-related presentations. I have spoken numerous times on the *Bureau of Prisons Issues* panel at the Federal Bar Association's and the U.S. Sentencing Commission's respective *Annual National Seminar on the Federal Sentencing Guidelines*. I also have presented to various Federal Public and Community Defender offices and Criminal Justice Act panels; to the DC Corrections Information Council; to the Association of Federal Defense Attorneys (webinar re: BOP's drug treatment programs); to the Connecticut Criminal Defense Lawyers Association (*Sentencing Pitfalls and Considerations in Dual Prosecutions: How To

2

*Ensure Concurrent State/Federal Sentences*); and to the New York State Association of Criminal Defense Lawyers (*Bureau of Prisons Designations and Half-Way House Litigation*).

6. Recognizing that Mr. El Bahnasawy is subject to a term of imprisonment, his counsel has asked me to provide this Declaration to offer an opinion and explanation concerning Mr. El Bahnasawy's possible placement within the BOP and related considerations, including the accommodation of Mr. El Bahnasawy's diagnosed mental health conditions.  In this regard, I have reviewed, among other things, Mr. El Bahnasawy's presentence investigation report (PSR); letters from Katherine Porterfield, Ph.D., John Mariani, M.D. and Ali Khadivi, Ph.D.; and health services records from the Metropolitan Correctional Center New York (MCC New York) from the period May 2016 to August 2017.

7. Mr. El Bahnasawy can expect to serve 87.14 percent of the sentence imposed under the BOP's custody and control — not the commonly but incorrectly assumed 85 percent — less any loss of good conduct time credits that might result from sanctions imposed in response to institutional rules violations. *See Barber v. Thomas*, 560 U.S. 474 (2010) (affirming time credit calculation formula); PSR ¶11.

8. Federal correctional institutions are commonly known by the security levels of the populations they house:  minimum (*a.k.a.*, camps), low and medium (Federal Correctional Institutions (FCIs)), high (penitentiaries), and administrative (pre-trial holding facilities, such as MCC New York or MDC Brooklyn; federal medical centers (FMCs); and the transfer hub in Oklahoma City).  Myriad factors influence both the placement security level for which an inmate qualifies and the actual location where he is housed.  For instance, the application of a public safety factor (PSF), which is intended to address information suggesting a need for greater

3

security precautions, or of a management variable, discretionary determinations as to what is the most appropriate level institution, can serve to override an inmate's security point total.

9. Mr. El Bahnasawy's <u>security point total</u> qualifies him for medium-security placement.

   a. Primary responsibility for prisoner placement rests with BOP officials at the Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas.

   b. To determine an offender's custody classification level, DSCC staff use the presentence investigation report and the judgment order, including the statement of reasons, to complete an Inmate Load and Security Designation Form, which is created and maintained in the BOP's computerized prisoner management and tracking system (*a.k.a.*, SENTRY).

   c. BOP Program Statement (P.S.) 5100.08, the *Security Designation and Custody Classification Manual* (9/12/2006), establishes policy and procedure regarding prisoner classification, including an assessment tool by which numerical values are assigned to ostensibly objective criteria that measure an individual's risk to public safety and institutional security. Points are assigned in nine areas: voluntary surrender status; severity of the current offense; Guidelines criminal history score; history of violence or escape (and attempts) and nature thereof; detainers and nature of associated charges; age; education level; and history of drug or alcohol abuse. A higher score signifies a higher classification level.

   d. Review of Mr. El Bahnasawy's PSR establishes a security point total of 16. He should receive the maximum number of points for the severity of the offense of conviction (+7) as well as for age (+8). He also receives one point (+1) for drug use

4

within the past five years. Of note, where the PSR confirms that Mr. El Bahnasawy dropped out of high school (¶91) and calls into question whether he is studying for his general equivalency diploma (GED) (¶93), counsel provided a copy Mr. El Bahnasawy's GED certificate, indicating that he did, in fact, earn a GED while housed at MCC New York. Where BOP policy directs attention to the PSR for verification that a defendant has earned his GED, no security points are attributed. (Otherwise, as many as two can be.).

e. With 16 points, Mr. El Bahnasawy qualifies for designation to a medium-security institution (P.S. 5100.08, Ch. 5, p. 12). Notably, a one-point reduction in Mr. El Bahnasawy's point total would qualify him for low-security placement. He can expect such a drop when it has been five years since his last drug use, and a four-point drop when he turns 24 years of age.

10. Mr. El Bahnasawy appears to qualify for the application of at least three public safety factors (P.S. 5100.08, Ch. 5, p. 7-11):

a. Where Mr. El Bahnasawy's offenses of conviction include those that the BOP considers of greatest severity, not only does he receive seven points (Para. 9(d), *ante*) but he is also subject to a "Greatest Severity" PSF. A Greatest Severity PSF precludes an inmate from being placed at anything lower than a low-security institution, meaning Mr. El Bahnasawy is ineligible for minimum-security (camp) placement.

b. Given Mr. El Bahnasawy's status as an "Illegal Alien" (*see* PSR cover pages), he is subject to a "Deportable Alien" PSF. Like a Greatest Severity PSF, a Deportable

5

      Alien PSF bars designation at anywhere lower than a low-security institution. Inmates subject to this PSF are also barred from pre-release transfer to intermittent confinement, specifically from placement at a halfway house and/or on home confinement, prior to the expiration of their sentences. It seems likely that upon the expiration of his prison term, or soon thereafter, Mr. El Bahnasawy will transfer from BOP custody to that of Immigration and Customs Enforcement (ICE) before being removed from the United States.

    c. Where Mr. El Bahnasawy's guideline range is Life, it appears likely that he will be subject to a "Sentence Length" PSF, which accounts for the amount of time that an inmate has remaining to serve (sentence imposed, less time served and anticipated good time credit). Those with more than ten years remaining to serve must be housed in at least a low-security institution; with more than 20 years to serve at medium-security; and more than 30 years to serve at high-security.

11. Approximately 30% of federal inmates are designated medium-security. According to the BOP, within that population subset, approximately 75% of prisoners have a history of violence, and 41% have been sanctioned for violating prison rules. The incidence of inmate violence (inmate-on-inmate, inmate-on-staff) is substantially greater at medium-security institutions than at lower security institutions. Consequently, life at an FCI-Medium is characterized by, *inter alia*, barbed-wire perimeter fencing, higher staff-to-inmate ratios, and more restrictive movement.

12. Experience, particularly the past approximate five years, shows that inmates within a general population, especially at higher security institutions, routinely approach new arrivals to

an institution requesting (demanding) that they produce case-related "paperwork" (*e.g.*, PSRs (which the BOP prohibits sentenced prisoners from possessing for his very reason), plea agreements, sentencing transcripts, docket sheets, etc.). Inmates also reach out to individuals in the community to obtain information about new arrivals (*e.g.*, asking someone to conduct an internet search). This interest in a new arrival's case information is derives, in large measure, from a desire to discover those who have cooperated with law enforcement (*i.e.*, "snitches") and those convicted of sex offenses. Leaving aside Mr. El Bahnasawy's apparent lack of inhibition to share beliefs that relate to his offenses (*see* PSR ¶11b), his distinct name, standing alone, suggests that any interested inmate, who knows someone in the community with Internet access, could readily learn about the conduct underlying Mr. El Bahnasawy's convictions and beliefs related thereto.

13.  In addition to security level (*i.e.*, minimum, low, medium, high, administrative), the Bureau of Prisons has, since 2006, classified institutions based on the level of mental health (as well as medical) care each is capable of providing. Care level classification is based, in part, on the resources available in the surrounding community and, in part, on the accommodation-related staffing of a given facility. Each facility is assigned a Mental Health (MH) Care Level (1-4). A MH Care Level 1 facility is intended for inmates with no identified mental health problems and those with stable conditions requiring psychological contact or clinical intervention no more than every three-to-six months. MH Care Level 2 is for those who require quarterly-to-monthly interventions. MH Care Level 3 connotes frequent intervention (weekly) over an extended period. MH Care Level 4 equates to psychiatric hospitalization.

14.  Where the Bureau of Justice Statistics has estimated that 45% of federal inmates

have mental health problems, as of May 2017 the BOP considered 4.2 percent of the federal inmate population as suffering from "serious mental illness," a diagnosable disorder within the past year that "resulted in functional impairment which substantially interferes with or limits one or more major life activities." GAO, *Federal Prisons: Information on Inmates with Serious Mental Illness and Strategies to Reduce Recidivism*, p. 2, 10 (Feb. 2018). Previously, the BOP provided that slightly more than 92% of the federal prison population qualified for MH Care Level 1 placement and less than 1% (combined) qualified for MH Care Level 3 or 4 placement. GAO, *Bureau of Prisons: Timelier Reviews, Plan for Evaluations, and Updated Policies Could Improve Inmate Mental Health Services Oversight*, p. 2 (July 2013). It now offers that the MH Care Level 1 population is closer to 95%. *Federal Prisons*, *supra*, at 7.

15. According to the PSR, Mr. El Bahnasawy reports mental health concerns dating back to age 15, when he began to experience auditory and visual hallucinations. PSR ¶71. Mr. El Bahnasawy reportedly decompensated when placed in the MCC's Segregated Housing Unit (SHU) (*a.k.a.*, 10 South). ██████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████

8

16. █████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

17. During the second Bush administration, contemporaneous to an increase in the federal prosecution of immigration-related offenses, the BOP grew its use of contract facilities to house non-U.S. citizens. During the latter stages of the Obama administration, there was an effort to curtail the use of contract facilities, to include effectuating closure. *See* Matt Zapotosky and Chico Harlan, *Justice Department says it will end the use of private prisons*, Washington Post (Aug 18, 2016). In a memorandum announcing the change, then Deputy Attorney General Sally Yates offered that private prisons "simply do not provide the same level of correctional services, programs, and resources" and, "as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security." *Id.*; *see* DOJ-OIG, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* (Aug. 2016)

(finding that contract facilities "incurred more safety and security incidents per capita than comparable BOP institutions").  Under the current administration, efforts to limit or discontinue the use of contract facilities have reportedly stopped, if not reversed.  *See* Matt Zapotosky, *Justice Department will again use private prisons*, Washington Post (Feb. 23, 2017) ("In a one-paragraph memo, Attorney General Jeff Sessions rescinded the previous directive to the Bureau of Prisons to either reduce or decline to renew private-prison contracts as they came due.").  The "majority" of inmates that the BOP currently houses at its 13 contract correctional institutions (excluding halfway houses) "are sentenced criminal aliens who may be deported upon completion of their sentence."  *See* https://www.bop.gov/about/facilities/contract_facilities.jsp.

18.  The BOP offers several institution-based, substance abuse programs.  *See* P.S. 5330.11, *Psychology Treatment Programs*, Ch. 2 (5/26/2016).  There is a 12-15 hour drug education course available to all inmates.  There is "non-residential" cognitive-behavioral therapy program, with groups meeting weekly for 90-120 minutes for 12 weeks.  And, there is an intensive 500-hour residential drug abuse program (RDAP).  Germane to Mr. El Bahnasawy's situation:  "A deportable inmate is unqualified for the RDAP because he or she cannot participate in the transitional drug abuse treatment component because he or she is not eligible for RRC placement."  *Id.*, Ch. 2, p. 9.  [NOTE:  CI Rivers, a contract facility, is an RDAP location; however, that program is for low-security D.C. Code Offenders the facility houses.].

19.  Although not binding, judicial recommendations do play an important role in the BOP's designation determinations.

    a.  The law requires the BOP to consider and account for judicial recommendations when assessing prisoner placement and programming options.  *See* 18 U.S.C.

§ 3621(b); *see also Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 245-46 (3d Cir. 2005) (discussing import of judicial recommendations under § 3621(b));

b. As set forth in BOP training materials distributed at one of the aforementioned Guidelines conferences:

> The BOP makes every attempt to designate an offender to the facility recommended by the sentencing court. However, if the court recommends a facility which does not meet your client's security level…, the BOP will designate your client to an appropriate institution….

*Bureau of Prisons Issues Presentation at the Annual National Federal Sentencing Guidelines Seminar*—Frequently Asked Questions (handout provided attendees).

c. Because several factors, such as population pressures, weigh on where the BOP designates a given defendant, it is often useful for a court to make a very specific statement concerning the reasons(s) for a recommended location or program and to recommend more than one placement option to facilitate its intended purpose(s).

20. Accounting for the foregoing and my experience generally, I offer the following opinions concerning Mr. El Bahnasawy's impending term of imprisonment:

a. Mr. El Bahnasawy will have a difficult time adjusting to confinement, particularly over the next several years. He is, *inter alia*, a young, mentally ill, slightly built foreigner whose serious offense conduct arises from an anti-American belief system. He has already been "the subject of threatening and disparaging remarks on the hands of inmates and correctional staff due to his practice of Islam and the nature of the offense." PSR ¶78. Once housed at his designated institution (*i.e.*, transferred from MCC New York), Mr. El Bahnasawy will likely have less direct contact with legal

counsel, their representatives or mental health professionals working with them. (Once Mr. El Bahnasawy is sentenced, the BOP will not permit outside mental health providers to treat him, as it appears occurred during the pendency of this case.). Absent such oversight, protection and assistance, Mr. El Bahnasawy will be more readily targeted, unable to hide the nature of his case from interested parties.  In this regard, it is significant that while Mr. El Bahnasawy's offenses were intended to inflict widespread harm, he does not appear to have a history of acting out in a physical or, more so, assaultive manner.  Between that and his apparent lack of criminal sophistication (*i.e.*, no criminal history), Mr. El Bahnasawy does not present as someone well equipped to defend himself in a higher security prison setting, where incidences of violence are greater.  Compounding this situation is that to the extent Mr. El Bahnasawy were to seek refuge in protective custody, it would mean SHU placement with which he has struggled (not unsurprisingly given his mental health issues).  The SHU is an isolated housing unit that institutions employ when punishing inmates (administrative segregation), when separating inmates from the general population for their own safety (protective custody), and when no bed is available for a newly arrived inmate.  Notable in this regard, experience shows that absent evidence of a clear, imminent threat of harm, BOP institutions require an inmate to remain in protective custody (SHU) for one year before initiating paperwork necessary to obtain re-designation to another facility.

b. [REDACTED]



c. Mr. El Bahnasawy will not receive intensive treatment for his documented substance abuse issues.

d. The BOP will be best able to manage Mr. El Bahnasawy's mental health issues if provided relevant reports and records. Experience, as confirmed by Bureau officials with whom I have presented, demonstrates that the agency welcomes, if not prefers, to receive such material via the eDesignate system, that is, the electronic system through which U.S. Probation transmits documents to the BOP. If counsel provides the materials to Probation, if possible as .pdf documents, they can be transmitted to the BOP in conjunction with the designation process, allowing officials to account for Mr. El Bahnasawy's needs based on information not contained in the MCC's records or in the PSR.

e. Understanding Mr. El Bahnasawy seeks designation to the Butner correctional complex, recommendation language that may help facilitate such a placement is:

> Recognizing he is a deportable alien, the Court highly recommends the defendant be housed at FCI Butner-Medium both to better assure his safety and to afford greater proximity to mental health services, as required.

13

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Date:   March 1, 2018
New Haven, Connecticut

                                               */s/ Todd Bussert*
                                            Todd A. Bussert