UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ABDULRAHMAN EL BAHNASAWY,

                        Defendant.

S1 16 Cr. 376 (RMB)

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
for the United States of America

Negar Tekeei
George D. Turner
Assistant United States Attorneys
   - Of Counsel -

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 2

I.   El Bahnasawy's Plot to Carry Out Terrorist Attacks in New York City for ISIS ............. 2

   A.   El Bahnasawy's Radicalization and Participation in ISIS's Global Online Network .... 3

   B.   The Plot to Attack New York City ......................................................... 6

   C.   El Bahnasawy's Conduct While Incarcerated ............................................. 13

II.   The Charges and El Bahnasawy's Guilty Plea ............................................. 15

III.   ██████████████████████████████████████████████ ........ 16

   A.   ████████████████████████████████ ......................................... 16

   B.   ██████████████████████████████████████ .................................... 17

   C.   ██████████████████████████████████████ ..................................20

   D.   ████████████████████ ................................................................. 23

   E.   ██████████████████████████ ........................................................ 24

DISCUSSION ............................................................................................................... 24

I.   Applicable Law.................................................................................................. 24

II.   The Undisputed Guidelines Sentence Is Life Imprisonment ............................................. 25

III.   The Statutory Sentencing Factors Call for a Sentence of Life Imprisonment .................. 29

   A.   The Nature and Seriousness of El Bahnasawy's Conduct and the Need for Just
        Punishment Warrant a Sentence of Life Imprisonment ............................................. 29

      1.   The Extreme Seriousness of El Bahnasawy's Terrorism Crimes Calls for
           a Sentence of Life Imprisonment ............................................................. 29

      2.   El Bahnasawy's Mental Health and Addiction Issues Do Not Support a Variance
           from the Guidelines Sentence of Life Imprisonment ................................................. 39

      3.   ██████████████████████████████████ ............................................................ 44

B.    A Sentence of Life Imprisonment Is Necessary to Protect the Public from Further Crimes of El Bahnasawy ........................................................................ 54

C.    A Sentence of Life Imprisonment Is Necessary to Afford Adequate Deterrence and Promote Respect for the Law ........................................................................ 58

D.    A Sentence of Life Imprisonment Will Avoid Creating Unwarranted Sentence Disparities ................................................................................................ 60

CONCLUSION ................................................................................................ 66

## **TABLE OF AUTHORITIES**

**Cases**

*Gall* v. *United States*, 552 U.S. 38 (2007) ............................................................ 24, 60

*United States* v. *Abdul Hakim Murad*, 93 Cr. 180 (LAK) (S.D.N.Y.) ........................................... 61

*United States* v. *Abu-Rayyan*, No. 16 Cr. 20098 (GCS), 2017 U.S. Dist. LEXIS 52820 (E.D. Mich. Apr. 6, 2017) .................................................................... 43

*United States* v. *Booker*, 543 U.S. 220 (2005) ............................................................ 24

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005) ..................................................... 24

*United States* v. *Fernandez*, 443 F.3d 19 (2d Cir. 2006) ........................................... 51, 52, 53, 60

*United States* v. *Lindh*, 227 F. Supp. 2d 565 (E.D. Va. 2002) ........................................... 28

*United States* v. *Martin*, 331 F. App'x 881, 2009 WL 2524003 (2d Cir. 2009) .......................... 53

*United States* v. *Meskini*, 319 F.3d 88 (2d Cir. 2003) ................................................ 27, 28, 54, 59

*United States* v. *Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y.) ........ 61, 62, 63, 64

*United States* v. *Oussama Kassir*, 04 Cr. 356 (JFK) (S.D.N.Y.) ................................................ 61

*United States* v. *Rattoballi*, 452 F.3d 127  (2d Cir. 2006) ............................................. 60

*United States* v. *Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass.) ................................................. 61

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) ............................................. 60

*United States* v. *Russell Salic*, 16 Mag. 7450 (S.D.N.Y.) ........................................... 11

*United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009) ..................................................... 27, 28, 58

*United States* v. *Talha Haroon*, 16 Mag. 6132 (S.D.N.Y) ............................................... 6

**Statutes and Sentencing Guidelines**

18 U.S.C. § 2332a ................................................................................... 15, 25, 62

18 U.S.C. § 2332b ................................................................................... 15

18 U.S.C. § 2332f ............................................................................................... 15, 25, 62

18 U.S.C. § 2339A ...................................................................................................... 15

18 U.S.C. § 2339B ................................................................................................. 15, 62

18 U.S.C. § 3553 .................................................................................................... passim

U.S.S.G. § 2M6.1 ......................................................................................................... 25

U.S.S.G. § 3A1.4 .......................................................................................... 25, 26, 27, 28

U.S.S.G. § 3D1.2 ......................................................................................................... 25

U.S.S.G. § 3D1.3 ......................................................................................................... 25

U.S.S.G. § 3E1.1 ......................................................................................................... 26

U.S.S.G. § 5A ............................................................................................................... 26

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796 .... 27

The Government respectfully submits this memorandum in connection with the sentencing of Abdulrahman El Bahnasawy ("El Bahnasawy" or the "defendant") scheduled for April 9, 2018, and in response to the defendant's sentencing submissions filed on March 2, 2018.[1]  El Bahnasawy is a 20-year-old Canadian citizen who pledged his allegiance to the Islamic State of Iraq and al-Sham ("ISIS"), worked online to support ISIS's recruitment and attack planning efforts, plotted with fellow ISIS supporters to carry out mass-casualty terrorist bombings and shootings in New York City, acquired chemicals and other bomb-making components for carrying out the attack, and traveled from Canada to the New York City area for the purpose of executing the attack.  Law enforcement thwarted the plot, preventing El Bahnasawy from killing and maiming innocent men, women, and children going about their daily lives in this city.  While incarcerated, months after his arrest, El Bahnasawy marked the walls of his prison cell with images and statements expressing his support for ISIS and terrorist attacks, and warning that more attacks were to come.

As explained below, the Government respectfully submits that the Court should sentence El Bahnasawy to life imprisonment, which is the sentence called for by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  Such a sentence is necessary and appropriate to reflect the abhorrent nature and extreme seriousness of El Bahnasawy's terrorism crimes, to provide just punishment for his conduct, to protect the public from potential future acts of terrorism by El Bahnasawy, to deter other young men from pursuing the path chosen by

---

[1] The Government is not aware of any page limitation that the Court imposes for sentencing submissions.  To the extent that this submission is subject to the Court's Individual Rules for memoranda of law, the Government respectfully requests an extension permitting the filing of this memorandum.  The additional pages are necessary to address the issues presented by this case, and to respond to the defendant's two sentencing submissions, which together total approximately 278 pages (including exhibits).

El Bahnasawy and seeking to perpetrate a similar attack on U.S. soil, and to avoid creating unwarranted sentencing disparities between El Bahnasawy and an array of other defendants who have been sentenced to life imprisonment after plotting to carry out a terrorist attack that was, like El Bahnasawy's, thwarted or ultimately unsuccessful.

The depravity and extraordinary seriousness of El Bahnasawy's conduct is beyond dispute. He worked over the course of months with high-level, Syria-based ISIS members and other ISIS supporters around the world to plan a large-scale terrorist attack in New York City, and he took numerous steps towards executing the plot, including acquiring bomb-making materials and traveling from Canada to the New York City area. El Bahnasawy's terrorism crimes, viewed in conjunction with his post-arrest conduct indicating continued radicalization and support for ISIS, demonstrate that El Bahnasawy poses a real and terrifying threat to our nation's and the world's security. A sentence of life imprisonment is appropriate in this case.

## **BACKGROUND**

### I.     **El Bahnasawy's Plot to Carry Out Terrorist Attacks in New York City for ISIS**

In the name of ISIS, El Bahnasawy sought to bring death and destruction to New York City. He and other ISIS supporters plotted bombings and shootings in the subways, at Times Square, and at concert venues. El Bahnasawy's goal was to kill and maim as many innocent men, women, and children as he and his co-conspirators could—all in support of ISIS, a terrorist organization that seeks to inflict violence and bloodshed on any who oppose it, and in particular on the United States. ISIS calls on its supporters who are unable to travel to the Middle East instead to conduct attacks in other countries. After months of collaborating with and supporting

2

ISIS operatives throughout the world via his global online network of ISIS supporters and attack planners, El Bahnasawy answered ISIS's call himself.  He mobilized co-conspirators, identified New York City and its residents and visitors as his target, sent bomb-making materials to the United States, and traveled from Canada to the New York City area in preparation to kill.  El Bahnasawy's plot was thwarted only because law enforcement infiltrated and stopped it.

A.    **El Bahnasawy's Radicalization and Participation in ISIS's Global Online Network**

El Bahnasawy began supporting ISIS in the fall of 2015, while he was living in Canada. Presentence Investigation Report, dated Nov. 21, 2017 ("PSR"), ¶¶ 19-20.[2]  He viewed pro-ISIS videos and propaganda justifying ISIS's activities and agenda, and throughout the ensuing months, he increased and intensified his online activities.  *Id.* ¶¶ 19-24.  El Bahnasawy began communicating with other ISIS supporters through certain encrypted messaging applications accessible on cellphones, various online pro-ISIS chat groups, and a social media website ("Website-1").  *Id.*

In approximately late 2015 or early 2016, El Bahnasawy met, via a particular encrypted electronic messaging application ("Application-1"), the Syria-based ISIS member Abu Sa'ad al-Sudani, a/k/a "Abu Isa Al Amriki" ("al-Sudani").  *Id.* ¶ 20.  Al-Sudani was a high-level ISIS recruiter and attack planner who was involved in plotting attacks against civilians in the West, including the United States, Canada, and the United Kingdom.  *Id.*  In approximately late 2015 or

---

[2] El Bahnasawy does not dispute the factual recitation of his offense conduct set forth in the PSR. *See* PSR at 20.

3

early 2016, El Bahnasawy began communicating regularly with al-Sudani, who played a key role in radicalizing El Bahnasawy.  *Id.*

Toward the beginning of his communications with al-Sudani, El Bahnasawy expressed his desire to join ISIS.  *Id.* ¶ 21.  In response, al-Sudani advised El Bahnasawy that he would need to send money and other materials in support of ISIS in order to attain "tazkia"—an Arabic term generally meaning "purity of the self" that is often used by ISIS members to mean that an individual has been "vouched for" or "cleared" as a trustworthy supporter.  *Id.*  At al-Sudani's direction, and in order to obtain *tazkia*, El Bahnasawy shipped multiple cellphones and wired approximately $500 to certain names and addresses specified by al-Sudani.  *Id.*  In the course of shipping the cellphones and sending the money, al-Sudani informed El Bahnasawy that he had attained *tazkia*, which was an important step in enabling El Bahnasawy to gain access to, and the trust of, other ISIS supporters and members.  *Id.*

By the spring of 2016, El Bahnasawy was communicating with numerous ISIS supporters around the world—some of whom aspired to travel to ISIS-controlled areas and join ISIS, some of whom were devoted to supporting ISIS's online activities, and others who were involved in plotting and facilitating attacks.  *Id.* ¶ 22.  Using various monikers to mask his true identity, including "Abu Abdullah," "Bin Hajar Al Inghimasi," "Al Canadi," "Hacker Caliphate," and "Binladen 911," among others, El Bahnasawy played several critical roles in ISIS's online network of operatives:

- El Bahnasawy used Website-1 to attempt to recruit other Website-1 users to support and join ISIS.  El Bahnasawy also vetted new online contacts to ensure they could be trusted by ISIS and ISIS supporters.  *Id.*  For example, El Bahnasawy sometimes

4

hacked into his contacts' cellphones in an effort to ensure they were not working for law enforcement. *Id.* On one occasion, when El Bahnasawy hacked into the cellphone of one of his U.S.-based contacts, El Bahnasawy concluded that the contact ("Contact-1") was working for law enforcement. *Id.* El Bahnasawy then posted a photograph and personal identifying information of Contact-1 that he had obtained when he hacked into Contact-1's phone—along with the statement "Anonymous Spy Wanted Dead"—to a pro-ISIS group on Application-1 with hundreds of followers to alert others that Contact-1 might be a spy, thereby enabling other ISIS supporters to target Contact-1. *Id.*

- El Bahnasawy and his online contacts worked together to facilitate connections among ISIS supporters. *Id.* ¶ 23. For example, when a certain ISIS supporter contacted El Bahnasawy, via Application-1, about planning an attack in a particular overseas country, El Bahnasawy introduced him (on Application-1) to one of El Bahnasawy's trusted contacts ("ISIS Member-1"), who had advised El Bahnasawy that he was involved in planning attacks for ISIS in different regions of the world. *Id.* In the course of their communications, ISIS Member-1 also put El Bahnasawy in contact with another ISIS member ("ISIS Member-2"), whom El Bahnasawy understood to be a high-level ISIS member based in Syria involved in ISIS's external operations and attack planning. *Id.* El Bahnasawy later communicated with ISIS Member-2 about the plot to attack New York City, and sought ISIS's support for the operation through ISIS Member-2. *Id.*

- El Bahnasawy was an administrator of various online groups of ISIS supporters on Application-1. *Id.* ¶ 24. Administrators of such groups could, among other things, add new users, manage messages posted by members of the group, and block or otherwise restrict the ability of other users from participating in the group. For example, El Bahnasawy was one of the administrators of a certain pro-ISIS group on Application-1 (which he was able to join through his connection to al-Sudani) that conducted hacking attacks in support of ISIS, including hacking cameras at an airport in a particular European country and hacking databases containing the names of U.S. law enforcement personnel. *Id.*

In sum, from approximately late 2015 up to his arrest on May 21, 2016, El Bahnasawy communicated with and helped to facilitate connections between dozens of ISIS members and supporters throughout the world, including high-level ISIS recruiters and attack planners—all in support of ISIS's deadly mission.

5

B.       The Plot to Attack New York City

In or about early 2016, after El Bahnasawy had attained *tazkia* by proving his loyalty to and support for ISIS, al-Sudani conveyed to El Bahnasawy, on Application-1, that he (al-Sudani) was involved in planning terrorist attacks on behalf of ISIS around the world.  PSR ¶ 25. Further, al-Sudani informed El Bahnasawy that he was seeking to coordinate a terrorist attack for ISIS in the United States, and encouraged El Bahnasawy to participate in such an attack in the United States.  *Id*.  In the ensuing weeks, El Bahnasawy began planning to carry out a suicide attack in support of ISIS targeting New York City (the "NYC Attack"), involving the detonation of improvised explosive devices ("IEDs"), as well as mass shootings, during the Islamic holy month of Ramadhan, which ran from approximately June 5 to July 5 in 2016.  *Id*.

In the spring of 2016, El Bahnasawy was contacted on Application-1 by an ISIS supporter with the username "Kill Kuffars,"[3] who is identified as "CC-1" in the charging instruments in this case.  "CC-1" is Talha Haroon ("Haroon"), a U.S. citizen based in Pakistan. Haroon was arrested in Pakistan in or about September 2016, and proceedings remain ongoing in Pakistan in connection with the Government's request to extradite Haroon to the United States to face charges in this District related to his participation in the NYC Attack plot.  *See* PSR ¶ 26; Compl., *United States* v. *Talha Haroon*, 16 Mag. 6132.  Haroon conveyed to El Bahnasawy that an associate of al-Sudani had directed Haroon to contact El Bahnasawy about participating in an attack targeting the United States.  PSR ¶ 26.  El Bahnasawy informed Haroon that he was

_____

[3] "Kuffar" is an Arabic term generally meaning "disbelievers."

6

involved in planning the NYC Attack, and Haroon agreed to join El Bahnasawy in carrying out the attack.  *Id.*  El Bahnasawy and Haroon agreed that the NYC Attack would involve the detonation of explosives, as well as possibly shooting civilians at a concert.  *Id.*  Haroon began arranging to travel from Pakistan to New York City to carry out the attack with El Bahnasawy. *Id.*

In the course of preparing to carry out the NYC Attack, El Bahnasawy also communicated with a certain individual via a particular encrypted electronic messaging application ("Application-2") whom El Bahnasawy believed to be a U.S.-based member of the online network of ISIS supporters that included al-Sudani, but who was, in fact, an undercover FBI agent (the "UC").  *Id.* ¶ 27.  The UC expressed a willingness to join El Bahnasawy and Haroon in carrying out the NYC Attack, and El Bahnasawy communicated with the UC on Application-2 about the plans and preparations for the attack.  *Id.*  El Bahnasawy also introduced Haroon to the UC on Application-2, for purposes of coordinating the attack.  *Id.*

In the course of their communications with the UC, El Bahnasawy and Haroon repeatedly declared their allegiance to ISIS, and expressed their intention of carrying out Paris- and Brussels-like terrorist attacks on behalf of ISIS in New York City.  El Bahnasawy explained to the UC that he was in contact with an ISIS affiliate about obtaining official sanction of the planned attacks by the Khorasan Province, a branch of ISIS active in Pakistan.  Compl. ¶ 16. Haroon informed the UC that he was in contact with ISIS associates within the Khorasan Province, and that "khurasan dawla [ISIS] has o[u]r back."  *Id.* ¶ 17.  El Bahnasawy stated to the UC that "[t]hese Americans need an attack," that he aspired to "create the next 9/11," and that he

7

planned to "com[e] to new York at around may 22" from Canada.  PSR ¶ 29; Compl. ¶¶ 20-21.

Haroon stated that he intended to fly from Pakistan to New York City to carry out the NYC

Attack with El Bahnasawy, and hoped to "cause great destruction to the filthy kuffars by our

hands."  Compl. ¶¶ 27-28.

El Bahnasawy purchased various materials on the Internet for purposes of constructing

IEDs to be used in the NYC Attack.  PSR ¶ 34.  For example, he purchased approximately 40

pounds of hydrogen peroxide (the "Hydrogen Peroxide") for making TATP (triacetone

triperoxide)—a powerful type of explosive that has been used in prior terrorist attacks—and

arranged for it to be delivered to the UC in the United States.  *Id.*  On or about May 11, 2016, the

UC received the Hydrogen Peroxide, which is shown in the image below:



*Id.*; Compl. ¶ 41. El Bahnasawy also purchased materials such as Christmas lights, batteries,

battery holders, thermometers, and aluminum foil, for use in constructing the IEDs to be used in

the NYC Attack.  PSR ¶ 34.  El Bahnasawy shipped the Hydrogen Peroxide and other bomb-making materials to the UC at an address in Ohio, to allow the UC to store the materials until El Bahnasawy and Haroon arrived in the United States to build the bombs and carry out the attack. *Id.* ¶¶ 34, 36.  El Bahnasawy, through his review of materials on pro-ISIS websites and his online communications with other ISIS supporters, had developed knowledge regarding the means and methods for constructing IEDs.  *Id*.

El Bahnasawy's operational plans for the NYC Attack included detonating explosives in the subway system and Times Square, as well as shooting civilians at a concert.  *Id.* ¶¶ 26, 30-32. On May 1, 2016, El Bahnasawy sent the UC multiple images of maps of the New York City subway system containing color-coded markings that depicted plans for attacking the subway system, including by identifying the particular subway lines in which explosives would be detonated, the routes that the attackers would travel, and the sequencing of the operation.  *Id.* ¶ 31.  Below is a copy of one such image that was sent by El Bahnasawy to the UC on or about May 1, 2016, in the course of describing the plan to attack the subway system:



Compl. ¶ 23.  On May 5, 2016, Haroon expressed to the UC that he believed the subway was a "perfect" target for the NYC Attack, that they should shoot as many passengers on the train as possible, including "women or kids," and that "when we run out of bullets we let the vests go off."  *Id.* ¶ 30.  On May 6, 2016, while discussing plans to detonate a bomb in Times Square, El Bahnasawy told the UC that "we need a really strong bomb"—and El Bahnasawy purchased the 40 pounds of Hydrogen Peroxide on the following day.  PSR ¶ 34; Compl. ¶ 24.  On May 12, 2016, El Bahnasawy sent the UC an image of Times Square and stated "we seriously need a car bomb at times square.  Look at these crowds of people!"  PSR ¶ 32; Compl. ¶ 33.  El Bahnasawy also stated that "me or u or Pakistani [*i.e.*, Haroon]" would be responsible for detonating the bomb.  Compl. ¶ 33.  That same day, El Bahnasawy also expressed his desire to "shoot up concerts cuz they kill a lot of people."  *Id.* ¶ 25.  In the course of his communications with the UC, El Bahnasawy also stated:  "These Americans need an attack, and we can't delay or cancel."

10

PSR ¶ 22; Compl. ¶ 21.  El Bahnasawy planned to publicize the attack, if successful, through videos to be uploaded to ISIS media outlets, for the purpose of promoting ISIS and attracting new followers.  PSR ¶ 32.

As the preparations for the attack progressed, in order to obtain additional funding for the operation, including for the purchase of additional materials for building the bombs, El Bahnasawy contacted al-Sudani to ask if there were other ISIS supporters who could provide financial support for the NYC Attack.  *Id.* ¶ 35.  In approximately April 2016, al-Sudani put El Bahnasawy in contact, on Application-1, with an overseas ISIS supporter with the username "Abu Khalid," who also became known to El Bahnasawy as "the Doctor."  *Id.*  "Abu Khalid" or "the Doctor" is identified as "CC-2" in the charging instruments in this case, and is Russell Salic, a Philippines citizen who was arrested in April 2017 in the Philippines, where proceedings remain ongoing in connection with the Government's request to extradite Salic to the United States to face charges in this District related to his participation in the NYC Attack plot.  *See* Compl., *United States* v. *Russell Salic*, 16 Mag. 7450.  Soon after that, El Bahnasawy began communicating directly with Salic on Application-1 about, among other things, their shared support for ISIS, their mutual connection with al-Sudani, the materials required to make explosives, the NYC Attack, and Salic sending money to help finance the NYC Attack.  PSR ¶ 35.  El Bahnasawy conveyed to Salic that he (El Bahnasawy) was part of a group that was planning to carry out an attack in support of ISIS involving the use of explosives and targeting New York City.  *Id.*  Salic expressed his support for the operation, and indicated that he would send money to help fund the planned attack.  *Id.*  El Bahnasawy told Salic to send money to the

11

United States in support of the NYC Attack and gave him information for how to send the money to the UC.  *Id.*  Later that week, on May 11, 2016, Salic wired approximately $423 to the UC in the United States to help finance the NYC Attack.  *Id.*

El Bahnasawy planned to build the IEDs and finalize preparations for carrying out the attack with Haroon at a rural cabin within driving distance of New York City, which El Bahnasawy helped to secure for the period following his planned arrival in the United States in late May 2016.  *Id.* ¶ 36.  El Bahnasawy initially called a campsite in upstate New York attempting to reserve a cabin, but the campsite did not have any availability.  *Id.*  El Bahnasawy thereafter discussed alternative options with the UC and ultimately approved a different campsite, also within driving distance of New York City, where the UC made a reservation at El Bahnasawy's request.  *Id.*  As El Bahnasawy prepared to travel to the United States, he transferred his collection of online ISIS contacts to one of his closest online associates, to enable that person to take over El Bahnasawy's role in facilitating connections within ISIS's online networks after El Bahnasawy had carried out the planned suicide attack in New York City.  *Id.*

On May 21, 2016, El Bahnasawy—while, unbeknownst to him at the time, heavily monitored by U.S. law enforcement—traveled by car from Canada to Cranford, New Jersey in preparation for staging and ultimately carrying out the planned attack.  *Id.* ¶ 37.  El Bahnasawy traveled to the United States for purposes of carrying out the attack under the guise of a pre-planned family trip, with his parents and sister.  *Id.*  El Bahnasawy told the UC, "I will be masked behind my parents back."  Compl. ¶ 36.  As El Bahnasawy had explained to the UC, El Bahnasawy intended to separate from his family and sneak away to meet Haroon and the UC, so

12

that they could prepare for and carry out the attack. *Id.* ¶ 37. El Bahnasawy directed the UC to pick him up at his hotel in the early morning hours of May 22, 2016. *Id.* ¶ 37. Upon arriving in Cranford, New Jersey on the night of May 21, 2016, El Bahnasawy was arrested by the FBI. PSR ¶ 37.

### C.   El Bahnasawy's Conduct While Incarcerated

El Bahnasawy has engaged in conduct while at the Metropolitan Correctional Center ("MCC") that is terrifying, particularly given the nature of his offenses. In the fall of 2016—several months after his arrest—El Bahnasawy marked the walls of multiple cells with images and statements expressing his continued support for ISIS and for terrorist attacks in the name of ISIS. A sampling of El Bahnasawy's wall markings—some of which he scrawled with his fingers, after removing the ink from a pen that he had obtained—is attached as Exhibit A. As reflected in Exhibit A, El Bahnasawy's wall markings included the following:

- The statement, "PLEDGE Alliance to ISIS Spread the Islamic State":



- An image of what appears to be a plane flying into the Twin Towers below the statement, "Fuck America":



- A list of recent terrorist attacks, encircled by what appears to be a heart, that includes references to "9/11," "Boston Bombers," "San bernadino Shooting," "Brussels Bombing," "Orlando Shooting," and "Manhattan Bombing," and concludes with, "and more coming":



14

Additionally, while at the MCC, El Bahnasawy engaged in conversations with multiple other inmates regarding ISIS, during which he made statements suggestive of continued support for ISIS and a desire to commit terrorist acts on behalf of ISIS.  PSR ¶ 11(b).  For example, El Bahnasawy discussed with other inmates scenarios such as flying a plane into the MCC, or placing explosives underneath police vehicles parked around the MCC.  *Id.*

El Bahnasawy has also used drugs while at the MCC.  Between on or about September 30, 2016 and on or about October 9, 2016, El Bahnasawy used buprenorphine (*i.e.*, suboxone, an opiate that is sometimes used in the treatment of addiction to opiates) on approximately seven occasions and marijuana on approximately two occasions.  *See* PSR ¶ 11.  El Bahnasawy last used suboxone while incarcerated at the MCC in May 2017.  *Id.* ¶ 86.

## II.  The Charges and El Bahnasawy's Guilty Plea

On May 20, 2016, El Bahnasawy was charged under seal in the Complaint with the following seven terrorism offenses arising from his participation in the NYC Attack: (1) conspiracy to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a; (2) conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b; (3) conspiracy to bomb a place of public use and public transportation system, in violation of 18 U.S.C. § 2332f; (4) conspiracy to provide material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (5) provision and attempted provision of material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (6) conspiracy to provide material support and resources to a designated foreign terrorist organization, namely, ISIS, in

15

violation of 18 U.S.C. § 2339B; and (7) provision and attempted provision of material support and resources to ISIS, in violation of 18 U.S.C. § 2339B.

As set forth above, El Bahnasawy was arrested by the FBI on Saturday, May 21, 2016 pursuant to an arrest warrant based on the Complaint.  On Monday, May 23, 2016, El Bahnasawy was presented before the Honorable Gabriel W. Gorenstein, U.S. Magistrate Judge, and was ordered detained on consent.

On June 1, 2016, a grand jury sitting in this District returned a sealed indictment, 16 Cr. 376 (RMB) (the "Indictment"), charging El Bahnasawy with the same terrorism offenses charged in the Complaint.  On June 16, 2016, El Bahnasawy appeared before this Court and was arraigned on the Indictment.

On October 13, 2016, El Bahnasawy pled guilty to a seven-count sealed superseding information, S1 16 Cr. 376 (RMB) (the "Information"), charging El Bahnasawy with the same terrorism offenses alleged in the Complaint and the Indictment.  From El Bahnasawy's arrest through October 6, 2017, the records of this case were placed under seal and subject to delayed docketing, pursuant to Court orders.

16

















## **DISCUSSION**

### I. **Applicable Law**

The Guidelines continue to provide strong guidance to district courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). While *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court explained, "a district court should begin all

24

sentencing proceedings by correctly calculating the applicable Guidelines range," which "should

be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18

U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics

of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of

sentences available"; the applicable Guidelines range itself; any relevant policy statement by the

Sentencing Commission; "the need to avoid unwarranted sentence disparities among

defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7);

*see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the
>          law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational
>          training, medical care, or other correctional treatment in the most
>          effective manner.

18 U.S.C. § 3553(a)(2).

## II.     The Undisputed Guidelines Sentence Is Life Imprisonment

It is undisputed that the Guidelines call for a sentence of life imprisonment.  As set forth

in the PSR, the defendant's Guidelines offense level is calculated as follows:

- All seven counts in the Information are grouped together into a single Group, pursuant to U.S.S.G. § 3D1.2(b).  PSR ¶ 43.

- Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the highest offense level of the counts within the Group, which in this case is the offense level applicable to Count One (conspiracy to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a).  *Id.* ¶ 44.

- The Guideline that applies to Count One is U.S.S.G. § 2M6.1.  Pursuant to § 2M6.1(a)(1), the base offense level for Count One is 42 because the offense was committed with the intent to injure the United States and aid a foreign terrorist organization.  *Id.* ¶ 45.

- Pursuant to U.S.S.G. § 3A1.4(a), because Count One is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added.  *Id.* ¶ 47.  The adjusted offense level for Count One therefore is 54.  *Id.* ¶ 50.[5]

- Assuming the defendant continues to demonstrate acceptance of responsibility prior to the imposition of sentence, *see* U.S.S.G. § 3E1.1(a), and because he timely notified authorities of his intention to plead guilty, *see id.* § 3E1.1(b), the offense level is decreased by three levels.  PSR ¶¶ 52-53.

- Accordingly, the total offense level is 51.  *Id.* ¶ 54.

- Because this is one of those "rare cases" where the offense conduct yields a Guidelines offense level higher than 43—which is the maximum offense level in the Sentencing Table set forth in the Guidelines—the offense level is treated as 43 for purposes of applying the Sentencing Table.  U.S.S.G. § 5A comment. (n.2); PSR ¶ 55.

The defendant does not have any known criminal convictions.  *Id.* ¶ 56.  However,

because the offense involved a federal crime of terrorism, the applicable criminal history

category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b).  PSR ¶ 57.  Accordingly, based on an

---

[5] The Government notes that the offense level calculation for Count Three (conspiracy to bomb a place of public use and public transportation system, in violation of 18 U.S.C. § 2332f) mirrors the offense level calculation for Count One, and also yields an offense level of 54.

offense level of 43 and a CHC of VI, it is undisputed that the applicable Guidelines range—or, in this case, Guidelines sentence—is life imprisonment. *Id.* ¶ 100; *see id.* at 20 (no objections received from either party regarding Guidelines calculation set forth above).[6]

While the defendant concedes that the applicable Guidelines range is life imprisonment, he suggests, without citing any authority, that his offense level and CHC are overstated as a result of the application of the 12-level terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a). *See* Def. Sentencing Mem., dated Mar. 2, 2018 ("Def. Mem."), at 26.  The suggestion is without merit.  In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States* v. *Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022).  The resulting "terrorism enhancement" at § 3A1.4(a) reflects Congress's intent that defendants, like El Bahnasawy, convicted of terrorism offenses serve sentences that are appropriate in light of their uniquely dangerous crimes.  As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer":  It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and

---

[6] The statutory maximum term of imprisonment applicable to Counts One, Two, and Three is life; the statutory maximum term of imprisonment applicable to Counts Four and Five is 15 years; and the statutory maximum term of imprisonment applicable to Counts Six and Seven is 20 years.  PSR ¶ 99.

> rehabilitating the criminal, and thus that terrorists and their
> supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).

The enhancement appropriately reflects the seriousness of the conduct in this case.  As set forth above, El Bahnasawy's activities in support of ISIS included plotting to carry out mass-casualty terrorist bombings and shootings in the heart of New York City, purchasing bomb-making materials to carry out the attack, recruiting co-conspirators to join him in the plot, and traveling from Canada to the New York City area to execute the attack.  This conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement.  Indeed, it is worth noting that, even without the terrorism enhancement, El Bahnasawy's total offense level (accounting for acceptance of responsibility) would be 39, just four levels below the maximum offense level provided for under the Guidelines.  In short, El Bahnasawy sought to carry out a large-scale terrorist attack in the United States on behalf of a terrorist group—his crimes are quintessential terrorism offenses of the utmost seriousness, and the Guidelines do not overstate the seriousness of his conduct.

Further, the enhancement's impact on the defendant's CHC is not inappropriate, as the defense suggests.  *See* Def. Mem. at 26.  Rather, the effect of the terrorism enhancement on the applicable CHC reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed.  *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319

28

F.3d at 92); *see also United States* v. *Lindh*, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002)

("Although the defendant has no prior criminal record, he is appropriately categorized in

Criminal History Category VI, rather than I, pursuant to USSG § 3A1.4.").

In sum, it is undisputed that the applicable Guidelines call for a sentence of life

imprisonment.  The Probation Office recommends imposing a life sentence as prescribed by the

Guidelines.  PSR at 21-23.  As explained below, the statutory sentencing factors, *see* 18 U.S.C.

§ 3553(a), also call for the imposition of a sentence of life imprisonment.

**III.    The Statutory Sentencing Factors Call for a Sentence of Life Imprisonment**

**A.    The Nature and Seriousness of El Bahnasawy's Conduct and the Need for
Just Punishment Warrant a Sentence of Life Imprisonment**

El Bahnasawy pledged his allegiance to ISIS's murderous agenda, collaborated with

high-level ISIS members based in Syria, and masterminded a sophisticated international plot to

execute mass-casualty terrorist bombings and shootings in the heart of New York City, with the

intention of killing as many unsuspecting men, women, and children as possible.  The nature and

seriousness of El Bahnasawy's conduct, and the need to impose just punishment, weigh

decidedly in favor of a sentence of life imprisonment.  *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A).

**1.    The Extreme Seriousness of El Bahnasawy's Terrorism Crimes Calls
for a Sentence of Life Imprisonment**

In or about late 2015, El Bahnasawy—then an 18-year-old resident of Canada—chose to

devote himself to ISIS and its terrorist ideology.  PSR ¶¶ 18-22.  El Bahnasawy radicalized

principally through viewing pro-ISIS propaganda on the Internet and communicating online with

other ISIS supporters.  *Id.* ¶ 19.  By the spring of 2016, El Bahnasawy was an established

member of ISIS's online network of supporters.  *Id.* ¶ 22.  He gained the trust of, and began

working on behalf of, al-Sudani, a high-level ISIS member based in Syria who was involved in

recruiting and attack planning for ISIS, and who was killed in a drone strike by coalition forces

in Syria on or about April 22, 2016.  *Id.* ¶¶ 20-21.  Prior to his death, in early 2016, al-Sudani

encouraged El Bahnasawy to participate in a terrorist attack on behalf of ISIS in the United

States.  *Id.* ¶ 25.  In the ensuing weeks, El Bahnasawy began plotting the NYC Attack.  *Id.*

During the spring of 2016, El Bahnasawy orchestrated and coordinated the NYC Attack

plans.  Among other things, El Bahnasawy recruited other ISIS supporters such as Salic to join

the plot, *id.* ¶ 35; he secured financing for the plot, *id.*; he was the hub of the conspiracy,

communicating directly with al-Sudani, Haroon, and Salic (who were not all in direct contact

with each other), *id.* ¶¶ 26, 35; he researched and identified targets for the NYC Attack—

specifically, the subway system, Times Square, and certain concert venues, *id.* ¶¶ 31-32; and he

developed and disseminated chilling attack plans, including subway maps with markings

identifying the train lines that would be bombed, the routes that the attackers would take, and the

sequencing of the operation, *id.* ¶ 31.  In short, El Bahnasawy was the driving force and

operational planner behind the NYC Attack plot.

There is no ambiguity as to El Bahnasawy's intentions:  he aimed to kill as many

civilians as possible for and in the name of ISIS.  He chose densely populated areas for the attack

to maximize the carnage.  Indeed, he advised the UC in explicit terms that Times Square was an

ideal target because of the "crowds of people" typically present.  *Id.* ¶ 32.  To inflict the death

and destruction, El Bahnasawy procured an array of bomb-making materials, including

approximately 40 pounds of hydrogen peroxide, as well as Christmas tree lights and batteries,
which he planned to use to make TATP and build IEDs.  *Id.* ¶ 34 (El Bahnasawy had developed
knowledge regarding construction of IEDs through communications with other ISIS operatives).
He planned to construct the bombs and stage the attack at a particular cabin located within
driving distance of Manhattan.  *Id.* ¶ 36.  On May 21, 2016, after weeks of plotting and
preparing, El Bahnasawy traveled from Canada to the New York City area, under the guise of a
pre-planned family trip, for the purpose of finalizing preparations and executing the NYC
Attack.  *Id.* ¶¶ 36-37.

El Bahnasawy's premeditated efforts to kill and maim scores of innocent men, women,
and children in this city with IEDs is utterly reprehensible and repugnant conduct.  As discussed
above, El Bahnasawy selected heavily populated locations as targets, and procured a large
volume of chemicals and bomb-making components capable of generating powerful IEDs, in
order to maximize the number of victims.  In addition to the human carnage, the NYC Attack
also likely would have resulted in extensive and costly property damage, including potentially
crippling damage to certain lines of the subway system.  Further, El Bahnasawy selected the
targets for the NYC Attack not only to maximize fatalities, but also to deliver a symbolically
powerful and terrorizing strike to the heart of New York City, by detonating bombs in iconic
Times Square, and in the subway system on which millions of New Yorkers rely every day.
During communications with the UC, El Bahnasawy made his aspirations crystal clear, stating
that he planned to show the people of New York City "what they hadn't seen [since] 2001" (a

31

reference to the attacks of September 11, 2011), and that "[w]e will shake them Insha'Allah." PSR ¶ 29.

That he ultimately did not succeed should not inure to his benefit. El Bahnasawy failed, not because he thought better of his murderous goals, but because the plot was disrupted by law enforcement and El Bahnasawy and certain of his co-conspirators were arrested. Had the attack played out as El Bahnasawy had planned, the lives of numerous residents and visitors of this city would have been lost, and countless others would have been forever traumatized. Nor would the impact have been confined to this region; had El Bahnasawy succeeded, as planned, to carry out a mass-casualty terrorist attack in the heart of New York City, the economic and emotional toll would have been felt nationwide, as it was after the attacks of September 11, 2001—and El Bahnasawy expressly stated that his goal was to "create the next 9/11." *See supra* at 7.

El Bahnasawy's attempt to carry out a potentially devastating terrorist attack in New York City, standing alone, warrants a sentence of life imprisonment. But El Bahnasawy also engaged in a variety of other activities to support ISIS, in addition to attack planning. Within the online network of ISIS members and supporters centered around al-Sudani, El Bahnasawy performed the important function of vetting new recruits to ensure they could be trusted and were not working with law enforcement. *Id.* ¶ 22. Recruiting supporters via the Internet who could be inspired, and trusted, to carry out ISIS's murderous agenda was a critical component of the group's operational blueprint. *Id.* ¶¶ 14-17 (ISIS gains supporters by spreading its message via social media and Internet platforms, and has leveraged such technology to incite supporters to carry out terrorist attacks).

32

The trust extended to El Bahnasawy by al-Sudani, and the nature and degree of El
Bahnasawy's responsibilities as part of the online network of ISIS supporters associated with al-
Sudani, underscore the importance of El Bahnasawy's contributions in furthering ISIS's agenda.
In addition to vetting recruits, El Bahnasawy also facilitated connections among other ISIS
members and supporters—including individuals seeking to carry out terrorist attacks on behalf of
ISIS—through various online applications and platforms.  *Id.* ¶ 23 (for example, when contacted
by El Bahnasawy via Application-1 about planning an attack on behalf of ISIS in a particular
overseas country, El Bahnasawy introduced that supporter (on Application-1) to one of El
Bahnasawy's trusted contacts, an ISIS member involved in planning attacks for ISIS in different
regions of the world).  This was another valuable service that El Bahnasawy provided to ISIS,
helping the group to broaden and strengthen its global online network of recruiters, attack
planners, and operatives.

El Bahnasawy's contributions to ISIS did not stop there.  He also served as an
administrator of a certain pro-ISIS group formed on a particular online platform (El Bahnasawy
gained entry to the group through his stature as a trusted associate of al-Sudani), whose members
perpetrated hacking attacks in support of ISIS, including hacking databases containing the names
of U.S. law enforcement personnel.  *Id.* ¶ 24.  As the foregoing reflects, the support provided by
El Bahnasawy to ISIS was multi-faceted, calculating, sophisticated, and valuable.  It was also
ruthless.  Not only did El Bahnasawy seek to slaughter innocent civilians by carrying out the
NYC Attack, he also deliberately targeted individuals working for law enforcement.  In the
course of vetting online recruits for ISIS, El Bahnasawy hacked into the cellphone of a U.S.-

33

based recruit, and concluded that the recruit was in fact working with law enforcement. *Id.* ¶ 22. El Bahnasawy did not merely cut ties with that individual; he disseminated a photograph and personal identifying information of the individual, along with the statement "Anonymous Spy Wanted Dead," to ISIS supporters online. *Id.* In other words, El Bahnasawy called upon his fellow ISIS supporters to seek out and murder the individual whom El Bahnasawy had determined to be associated with law enforcement.

Furthermore, El Bahnasawy's conduct was neither isolated nor the product of caprice or a momentary lapse in judgment. El Bahnasawy worked to support ISIS for an extended period, from late 2015 until his arrest in May 2016. He planned and plotted for more than a month to carry out the NYC Attack. As his actions and communications demonstrated in chilling and explicit terms, El Bahnasawy was a proud and devoted supporter of a global terrorist organization dedicated to murdering non-believers in the West. El Bahnasawy was so committed to the cause that he deceived and planned to abandon his family—his parents and his sister— after traveling with them to the United States, so that he could complete preparations for, and execute, the NYC Attack. *Id.* ¶¶ 36-37. Indeed, El Bahnasawy fully intended to die for ISIS's cause in the NYC Attack—to strap explosives to his body, position himself near unsuspecting civilians, and blow himself up—in his depraved quest to murder Americans in the name of ISIS. *Id.* ¶ 36 (El Bahnasawy planned to execute suicide attack). And El Bahnasawy's plans did not stop with his own death, and the carnage and destruction that he intended to cause in the NYC Attack—El Bahnasawy also planned for the attack, if successful, to be publicized and glorified through videos to be uploaded to ISIS media outlets, for the purpose of promoting ISIS and

34

attracting new followers.  *Id.* ¶ 32.  This further illustrates the depths and the fervency of El Bahnasawy's devotion to ISIS and its deadly agenda.  He offered his services, his technological savvy, and ultimately his life, to further the group's mission of murder and terror.  The exceedingly serious nature of El Bahnasawy's conduct, and the need for just punishment, militate strongly in favor of a sentence of life imprisonment.

The defense does not contest the seriousness of El Bahnasawy's conduct in its submissions, nor could it.  El Bahnasawy has admitted to the almost unimaginable: seeking to conduct a suicide attack in New York City that would result in the mass murder of innocent civilians.  But the defense submissions do make various implicit attempts to minimize the gravity of El Bahnasawy's conduct, none of which have any traction on the undisputed facts of this case.

For example, the defense repeatedly notes that when El Bahnasawy traveled to the United States on the date of his arrest, he did so with his family.  *See, e.g.*, Def. Mem. at 3, 19.  ███████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████  Indeed, as El Bahnasawy made clear in his communications with the UC, he plotted and planned for weeks to use his family's trip to New York City in late May 2016 as the mechanism for crossing into the United States to execute the planned attack.  El Bahnasawy's use of the family trip as the means for putting himself in position to carry out the NYC Attack only underscores the premeditated, calculating, and deceptive nature of his plotting.

Further, that El Bahnasawy was "allowed" to cross the border and travel to the New York City area with his family in no way indicates that he was not perceived to be a threat.  *See* Def.

35

Mem. at 19. Quite the opposite, and as the defendant may be unaware, U.S. state and federal law enforcement, in coordination with Canadian authorities, closely monitored the defendant's travel that day and could have acted to intervene at any time if necessary. The location of his arrest was based on tactical and operational considerations. The assertion that no "contraband" was found in the car or El Bahnasawy's Toronto residence after the arrest, *see id.*, is also misleading. In fact, a flash drive was found in El Bahnasawy's room in the Toronto house containing particular computer software used to facilitate encrypted communications, which El Bahnasawy had specifically described using during his communications with the UC. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

And it is hardly surprising or significant that other items were not found in the car or residence— El Bahnasawy had already shipped the bomb-making materials for the NYC Attack to the United States, ████████████████████████████████

██████████████████████████████████████████

    Nor is there any doubt that El Bahnasawy planned to go through with the attack had he not been arrested, contrary to the implicit suggestions in the defense submissions. *See, e.g.*, Def. Mem. at 10, 27. ████████████████████████████████

████████████████████████ As set forth in the PSR, shortly before traveling to the United States, El Bahnasawy transferred his collection of online ISIS contacts to a trusted ISIS associate, so that the associate could continue communicating with those contacts after El Bahnasawy executed the suicide attack. PSR ¶ 36. ████████████████████████

36

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

The defense also attempts to brush off El Bahnasawy's online activities as visiting extremist "chatrooms."  *See, e.g.*, Def. Mem. at 3.  As reflected above, that does not begin to capture the nature, extent, sophistication, and significance of El Bahnasawy's online activities in support of ISIS.  El Bahnasawy used highly sophisticated, encrypted electronic communications platforms to communicate surreptitiously with ISIS members and supporters around the world. He was not a passive consumer of extremist propaganda; rather, while online, he plotted and coordinated the NYC Attack, vetted recruits for al-Sudani's network, facilitated connections between ISIS supporters looking to carry out attacks, and administrated pro-ISIS chat groups. *See supra* at 4-5.  Moreover, while El Bahnasawy sometimes communicated with other ISIS supporters via the medium of pro-ISIS chat groups, he also regularly and extensively engaged in one-on-one communications with his numerous ISIS contacts, including high-level ISIS members based in Syria.  El Bahnasawy did not become a trusted, widely known member of al-Sudani's network by wandering into an extremist chatroom or two.  Day after day, for months, El Bahnasawy intensively and affirmatively provided support to ISIS and furthered its cause through his variety of online activities.

The defense submissions also insinuate that FBI undercover agents somehow induced El Bahnasawy to carry out the NYC Attack, and that the FBI improperly targeted El Bahnasawy

37

because of his purported vulnerabilities relating to mental health and addiction issues.  *See, e.g.*, Def. Mem. at 4, 19.  That these claims are not made directly—but rather merely suggested without any factual backstopping—is telling, as the claims are divorced from the reality of what transpired.  This was the infiltration of a live terrorist plot.  As discussed above, El Bahnasawy was recruited to conduct a terrorist attack for ISIS in the United States by al-Sudani, a high-level ISIS member based in Syria.  *See supra* at 3, 6; ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████.  When the UC came into contact with El Bahnasawy, El Bahnasawy was an operational terrorist plotting and planning to carry out an attack in the United States for ISIS. PSR ¶¶ 25-27.  Through the UC's access, the FBI was able to disrupt the NYC Attack and arrest El Bahnasawy, as well as two of his co-conspirators.  This case serves as an example of law enforcement working effectively to prevent a potentially devastating terrorist attack on this city before it could occur.

As the foregoing makes clear, the notion that the FBI targeted El Bahnasawy because of his youth or purported vulnerabilities is patently absurd.  The FBI did not choose El Bahnasawy; he chose himself, when he decided to join the ranks of ISIS supporters and plotted to kill Americans in the United States.  That Canadian authorities apparently learned—on May 16, 2016, just five days before El Bahnasawy's arrest—that El Bahnasawy had received unspecified "treatment/services" at the Centre for Addiction and Mental Health ("CAMH") in Toronto for several months in 2014 is utterly irrelevant.  *See* Def. Mem. at 4, Ex. X.

As an initial matter, the defense's speculation that this information was "presumably shared with the United States," Def. Mem. at 4, is unsupported and irresponsible.  On February 23, 2018, the defense served a discovery request on the Government specifically requesting the production of "any materials in the possession of the government from any medical or mental health institution or provider that [the] government received *prior* to Mr. El-Bahnasawy's arrest in the United States on May 21, 2016" (emphasis in original).  A search was conducted, including of the files of relevant components of the FBI.  Following that search, the Government informed the defense in writing on February 28, 2018—prior to the filing of the defense submissions—that the Government was not in possession of any such materials.  There is thus no reason to believe that the FBI was aware of El Bahnasawy's medical history during its investigation of the NYC Attack plot.  But in any event, all of this is merely a distraction with no conceivable relevance to sentencing.  El Bahnasawy was a member of al-Sudani's network plotting to attack the United States, and the FBI worked, successfully, to neutralize the threat posed by El Bahnasawy and his co-conspirators.  Whether the FBI also learned during its investigation that El Bahnasawy might have mental health or addiction issues is simply immaterial.  Indeed, it is likely that such potential mental instabilities only heightened the threat that El Bahnasawy posed to this country.

### 2. El Bahnasawy's Mental Health and Addiction Issues Do Not Support a Variance from the Guidelines Sentence of Life Imprisonment

In the face of the indisputably grave nature of El Bahnasawy's crimes, the defendant's submission does little more than advance the claim, stated in various ways, that because El

Bahnasawy has certain mental health and addiction issues, leniency at sentencing is appropriate. The Government does not have reason to dispute that El Bahnasawy has certain mental health and addiction issues.  But when considered in light of the abhorrent and almost indescribably serious nature of El Bahnasawy's conduct, as well as the other sentencing factors discussed below, including the need to protect the public, those mental health and addiction issues do not support a variance from the applicable Guidelines sentence of life imprisonment.

El Bahnasawy's asserted mental health and addiction issues cannot explain or justify his conduct.  El Bahnasawy's attack plotting was chillingly lucid, sophisticated, and determined. Among other things, he maintained and communicated with a vast array of ISIS contacts around the world, managing to keep track of different usernames, passcodes, and identifiers; he used highly sophisticated encryption technology when conducting online activities in support of ISIS in a concerted effort to avoid law enforcement detection; he recruited co-conspirators and arranged financing for the NYC Attack; he educated himself on how to build IEDs through online research and communications with other ISIS supporters; he purchased and shipped to the United States an array of bomb-making components for use in the NYC Attack; he had the foresight to secure a cabin within driving distance of New York City to stage the attack; he used a pre-planned family trip to the United States to put himself in position to execute the attack, deceiving his family as to his true intentions all along; and he even made plans for furthering ISIS's murderous agenda after his death, by passing off his ISIS contacts to a trusted associate. These are the premeditated and calculated measures of an individual fully responsible for his actions, who now should be held fully accountable for them. █████████████████

40

███████████████████████████████████████████████████████

███████████████████████████████████████  Further, it is undisputed that El Bahnasawy

was not using narcotics during the period of his support for ISIS and attack plotting.  *See* Def.

Mem. at 8.  That he has a history of drug abuse, which does not set him apart from countless

other defendants, hardly constitutes a material mitigating consideration under the circumstances

present in this case.

Indeed, El Bahnasawy's letter to the Court in connection with sentencing, filed March 2,

2018 (the "El Bahnasawy Letter"), has the presumably unintended effect of confirming the

terrifyingly calculating and coherent—but depraved—nature of El Bahnasawy's mission to kill

in the name of ISIS.  *See* Def. Mem. Ex. C.  El Bahnasawy explains that he sought to exact

revenge, in the name of ISIS, for airstrikes conducted by the United States and its allies in the

Middle East, and that he made a considered decision to target the United States, instead of

Canada, with his attack:

> I was very frustrated as I seen the falsehood of the system and terms
> the U.S. and there allies try to impose, but this led me to military
> jihad.  I thought that they use tactics of disrupting our life and
> murdering our civillians with reckless airstrikes (whether purposely
> or non-purposely), and that it was appropriate to simular methods
> back until and unless they stop.  Canada had recently stopped
> airstrikes at the time, and it didn't make sense to transgress back
> against them in such a way, that is why I came to the U.S. (for the
> Plot).

*Id.* at 20.

The El Bahnasawy Letter also highlights the knowing and determined nature of his

offense conduct.  He recounts that, one day during the course of plotting the NYC Attack, a

passcode that he had written down for communicating with his ISIS contacts and the UC was not working. *See id.* at 22.  El Bahnasawy states that he "remember[s] thinking it was a message from God to just forget about the Plot and do something else with my life, but unfortunatly, I remembered that I had written it backwards."  *Id.*  El Bahnasawy then proceeded to continue coordinating and planning the attack.  This vignette further demonstrates that El Bahnasawy knew exactly what he was doing, knew it was wrong, and nevertheless made the conscious choice to continue down that path.  The resolute determination that El Bahnasawy displayed in plotting the NYC Attack was also apparent in the course of this prosecution, as he steadfastly resisted significant and repeated pressure from his parents to change counsel—because *he* did not want to change counsel.  *See* Def. Mem. at 22; ████████████████████.  In short, while the defense submissions attempt to portray El Bahnasawy as a weak-willed and vulnerable victim, nothing could be further from the truth.  El Bahnasawy may be polite, soft-spoken, and articulate, but make no mistake—behind that veil is a dangerous and calculating man who displayed a knowing, willing, and steadfast desire to kill in plotting the NYC Attack.

████████████████████████████████████

████████ the defense has been engaged in a long, drawn-out odyssey to find or create an excuse for El Bahnasawy's conduct.  But one does not exist.  El Bahnasawy pledged his support to ISIS and sought to mass murder civilians in New York City in its name.  His actions were knowing and determined.  His mental health and drug addiction issues cannot and do not explain or excuse his conduct, and should not be deemed material mitigating considerations in light of the extreme seriousness of that conduct.  Indeed, if anything, El Bahnasawy's asserted

instabilities and addictive tendencies only further underscore the need for a sentence of life imprisonment to protect the public from a future attack or other criminal conduct by El Bahnasawy. *See infra* at 54-58.

Nor do El Bahnasawy's asserted mental health and addiction issues warrant a variance under 18 U.S.C. § 3553(a)(2)(D) (sentencing purpose of "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). The Bussert Declaration submitted by the defense in purported support of that argument does not, in fact, counsel in favor of imposing a term of imprisonment below the applicable Guidelines sentence. *See* Def. Mem. at 16-17 & Ex. G. Instead, the declaration simply catalogues a variety of factors—including a defendant's mental health history and drug abuse history—that are generally considered by the BOP when determining the appropriate facility to which an inmate should be designated after sentencing. *See* Def. Mem. Ex. G. Moreover, as the declaration acknowledges, mental health treatment and drug addiction treatment are available in the federal prison system. *See id.* ¶¶ 13, 18; *cf. United States* v. *Abu-Rayyan*, No. 16 Cr. 20098 (GCS), 2017 U.S. Dist. LEXIS 52820, at *25 (E.D. Mich. Apr. 6, 2017) (addressing § 3553(a)(2)(D), in the course of imposing above-Guidelines sentence, and stating that "[t]he court may recommend that Abu-Rayyan receive mental health and substance abuse treatment while incarcerated"). Judicial recommendations can be important in securing such treatment, *see* Def. Mem. Ex. G ¶ 19, and defense counsel are, of course, free to seek any such recommendations here. Nor is El Bahnasawy in any sense unique among federal criminal inmates in his asserted need for mental health and drug addiction treatment while serving the

43

term of his incarceration.  *See* Def. Mem. Ex. G ¶ 14 (as many as 45% of federal inmates have

mental health issues).  In any event, even to the extent this sentencing factor weighs to some

limited extent in favor of El Bahnasawy, it is overwhelmingly outweighed by the need to impose

a sentence of life imprisonment to appropriately reflect the extreme seriousness of his conduct, to

protect the public, and to deter other would-be terrorists.























**B.     A Sentence of Life Imprisonment Is Necessary to Protect the Public from Further Crimes of El Bahnasawy**

The need to protect the public from further crimes of this defendant, *see* 18 U.S.C.

§ 3553(a)(2)(C), is a paramount consideration here, and strongly supports the imposition of a life

sentence.  Terrorism is a crime with high recidivism rates and the rehabilitation of terrorists like

54

El Bahnasawy is notoriously difficult.  *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  El Bahnasawy's willingness to kill innocent civilians and martyr himself for ISIS, his absolute commitment to ISIS at the time of his arrest, and his deeply disturbing conduct since then indicative of continued allegiance to ISIS and terrorist ideology, powerfully support a single conclusion: the incapacitation of El Bahnasawy should be total and lifelong.

As discussed above, at the time of his arrest, El Bahnasawy was a committed supporter of ISIS and the radical Islamic terrorist ideology that it espouses.  El Bahnasawy was indoctrinated at a young age, as a teenager.  PSR ¶¶ 18-21.  He gained the trust of, and developed connections with, high-level ISIS members and other likeminded supporters and operatives.  *Id.* ¶¶ 20-24.  He assisted ISIS in its effort to recruit and vet new followers.  *Id.* ¶ 22.  He plotted and planned to kill scores of innocent civilians on behalf of ISIS in the NYC Attack.  *Id.* ¶¶ 25-37.  At the time of his arrest in May 2016, El Bahnasawy was prepared to martyr himself in the ensuing days to further ISIS's cause.  *Id.*  In short, the facts leave no doubt that El Bahnasawy's commitment to ISIS and its terrorist agenda was absolute.

Moreover, El Bahnasawy is a young man, now 20 years old, and fully capable of resuming support for ISIS and radical Islamic ideology.  Indeed, far from being a mitigating factor, *see* Def. Mem. at 19, El Bahnasawy's age increases the risk that he poses.  *See* Def. Mem. Ex. G ¶ 9(d) (BOP inmate security classification system views El Bahnasawy's age as heightening the risk that he poses to public safety and institutional security).  Moreover, many of

the characteristics and skills that made him an attractive operative to ISIS—for example, fluency in English, computer and technological proficiencies, ties to Western countries, and proximity to the United States—are likely to remain with El Bahnasawy for the rest of his life.  While El Bahnasawy's physical capacity to carry out a suicide attack might diminish at some point with age, the role that he fulfilled for ISIS was in significant part non-physical, as it included recruiting and vetting followers, facilitating online connections among fellow supporters, and coordinating online pro-ISIS groups.  He could seek to resume such activities at any point if released, whether for ISIS or for another group espousing the sort of anti-American terrorist ideology that he previously embraced and served.

El Bahnasawy's post-arrest conduct while incarcerated at the MCC further confirms that a life sentence is necessary and appropriate.  More than five months after his arrest, in the fall of 2016, after pleading guilty to supporting ISIS and attempting to carry out the NYC Attack, El Bahnasawy marked his cell walls with drawings and statements expressing support for ISIS and terrorist attacks in the name of ISIS.  PSR ¶ 11(b); Ex. A (images of El Bahnasawy's wall markings).  El Bahnasawy's method—he removed the ink from a pen and used his fingers to scrawl markings on the walls—seems indicative of a deeply disturbing combination of fanaticism and resourcefulness.  A sampling of El Bahnasawy's chilling wall markings includes: "PLEDGE Alliance to ISIS Spread the Islamic State"; an image of what appears to be a plane flying into the Twin Towers below the statement, "Fuck America"; and a list of recent terrorist attacks, encircled by what appears to be a heart, which references "9/11," "Boston Bombers," "San Bernardino Shooting," "Brussels Bombing," "Orlando Shooting," and "Manhattan

Bombing," and concludes with the statement: "and more coming."  Ex. A.  El Bahnasawy also made statements to other inmates suggestive of continued allegiance to ISIS and a desire to commit terrorist acts.  PSR ¶ 11(b) (for example, El Bahnasawy discussed placing explosives underneath police vehicles parked around the MCC).  ███████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

█████████████████████████

     El Bahnasawy's conduct at the MCC is, simply put, terrifying when viewed in the context of the conduct that led to El Bahnasawy's arrest—plotting a terrorist attack in New York City for ISIS.  El Bahnasawy's post-arrest conduct, in conjunction with his offense conduct, support the conclusion that if he receives less than a life sentence, he is likely to leave prison and return to supporting the extremist and violent ideology espoused by ISIS, and trying to kill Americans in furtherance of those beliefs.  El Bahnasawy should not be given that opportunity.  The nature of El Bahnasawy's crimes was heinous, wanton, life threatening, and if El Bahnasawy is ever again at liberty in the community, he would pose a clear and present danger and threat to society.  The protection of the public from El Bahnasawy warrants a life sentence.

    Not surprisingly, El Bahnasawy now advances the self-serving claim, for purposes of sentencing, that he has disavowed ISIS and violence.  *See, e.g.*, Def. Mem. at 5, 9, 16.  But actions speak louder than words.  And El Bahnasawy's actions—his offense conduct and his post-arrest conduct—make chillingly clear the threat that he would pose if released.  ██████████

 El Bahnasawy's self-serving

claim that he has reformed during his time in prison is belied by his actions and a transparent

attempt to obtain a lesser sentence.  Even El Bahnasawy's own letter to the Court indicates that

he continues to hold some of the same beliefs that led him down the path of violent jihad, as he

asks the Court to embrace Islam and see "the falsehood of the current system."  Def. Mem. Ex. C

at 23-24; *see also id.* at 18-20.  Indeed, the El Bahnasawy Letter reads, in large part, as a startling

justification for jihad.  Furthermore, while the defense attempts to portray El Bahnasawy's

mental health and addiction issues as mitigating factors, as a practical reality, El Bahnasawy's

professed instabilities and obsessive, addictive nature only compound the risk that he would, if

released, return to violent and destructive behavior.  In sum, the need to protect the public from

El Bahnasawy overwhelmingly militates in favor of a Guidelines sentence of life imprisonment.

### C.    A Sentence of Life Imprisonment Is Necessary to Afford Adequate Deterrence and Promote Respect for the Law

A Guidelines sentence of life imprisonment also is necessary to serve the sentencing

goals of adequately deterring criminal conduct—in this case, terrorism aimed at murdering

Americans—and to promote the law prohibiting such horrific conduct.  *See* 18 U.S.C.

58

§§ 3553(a)(2)(A), 3553(a)(2)(B).  As Judge Walker stated in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  *Stewart*, 590 F.3d at 181.

General deterrence is particularly important in today's environment, where so many young men and women in the West, including Americans, have gravitated towards ISIS's online calls to embrace and pursue violent jihad, and have either traveled to the Middle East to join and fight for ISIS or have sought to perpetrate terrorist attacks in the name of ISIS in their home countries.  El Bahnasawy was an 18-year-old, English-speaking Canadian living comfortably in a Toronto suburb when he chose to deviate, to pursue a path of radical Islamic extremism, to devote himself to ISIS, and to carry out a terrorist attack in the heart of New York City.  It is vital for our country's national security—and for the security of this city, a perpetual target of such terrorist plots—that other young men and women who reside in the United States, or (like El Bahnasawy) have the ability to travel to the United States, when exposed to hateful extremist teaching, are deterred from choosing to follow a path similar to El Bahnasawy's and engaging in potentially devastating conduct in support of ISIS or other terrorist groups.  Only a sentence of life imprisonment—the sentence called for by the Guidelines—will adequately serve this pressing need for such deterrence.  Those who are considering devoting themselves to terrorism must know a simple truth: if they kill or conspire to kill innocent American men, women, and children, as El Bahnasawy did, when they are caught, they will be prosecuted in an Article III court and then imprisoned for life.

With respect to specific deterrence, for the reasons discussed above, a life sentence is warranted to protect the public from further terrorism crimes of this particular defendant, in light of the nature of his conduct, both before and after his arrest. *See supra* at 54-58. Those same reasons apply to the specific deterrence analysis, and dictate the conclusion that a Guidelines sentence of life imprisonment is needed to adequately deter El Bahnasawy from resuming support for ISIS—by preventing him from having the opportunity to do so. *See Meskini*, 319 F.3d at 91-92 (difficulty of deterring terrorism defendants supports longer periods of incarceration in such cases). In sum, society's interest in effective deterrence overwhelmingly calls for a Guidelines sentence of life imprisonment.

**D.    A Sentence of Life Imprisonment Will Avoid Creating Unwarranted Sentence Disparities**

The need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" strongly supports the imposition of a Guidelines sentence of life imprisonment in this case. *See* 18 U.S.C. § 3553(a)(6).

As an initial matter, the undisputed Guidelines imprisonment range is life. As the Second Circuit has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (internal quotation marks and citations omitted); *cf. Fernandez*, 443 F.3d at 28 (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))). "[T]o secure nationwide consistency, the

Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50.  Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities."  18 U.S.C. § 3553(a)(6).  As discussed above, a life sentence is commensurate with the extreme seriousness of El Bahnasawy's terrorism crimes.  Indeed, the Guidelines offense level applicable to El Bahnasawy's conduct is 51, which is well above the offense level of 43 that triggers a Guidelines range of life imprisonment irrespective of a defendant's criminal history.  *See supra* at 26.

While a sentence of life imprisonment is never routine, life sentences are regularly imposed in federal courts in cases where, as here, the defendant knowingly and willfully associates himself with a foreign terrorist organization—like ISIS, al Qaeda, or al Qaeda in the Arabian Peninsula—that is dedicated to murdering U.S. citizens and attacking U.S. interests. Importantly for purposes of this case, courts both within and outside of this District have imposed life sentences in terrorism cases where, as here, the defendant conspired or attempted to carry out an attack targeting Americans, but the plot ultimately was thwarted or unsuccessful such that nobody was hurt, and life imprisonment was not mandatory.  *See, e.g.*, *United States* v. *Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired to bomb U.S. embassies in Singapore and the Philippines); *United States* v. *Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate shoe bomb during international flight); *United States* v. *Abdul Hakim Murad*, 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on airliners bound for United States

61

from Asia); *see also United States* v. *Oussama Kassir*, 04 Cr. 356 (JFK) (S.D.N.Y. Sept. 15, 2009) (life sentence for al Qaeda supporter who attempted to establish a jihad training camp in the United States and disseminated bomb-making manuals).

The defense cites the "Extremism Tracker" published by George Washington University's Program on Extremism (the "GW Tracker"), which reports, among other things, that since March 2014, 157 individuals have been charged in the United States with offenses relating to ISIS, and that the average sentence of those convicted is 13.6 years' imprisonment. *See* Def. Mem. at 26.  That figure (13.6 years) is not a relevant benchmark for this case for a number of reasons that the defense ignores.  First, many of the cases underlying the GW Tracker did not—unlike this case—involve a successful or thwarted terrorist attack, but rather involved activity such as attempting to travel overseas to join ISIS.  Indeed, the GW Tracker indicates that only 33% of the underlying cases involved defendants accused of being involved in plots to carry out attacks on U.S. soil.  *See* https://extremism.gwu.edu/gw-extremism-tracker.  Second, and relatedly, because of the comparatively less severe conduct at issue, many of the cases underlying the GW Tracker only involved charges, such as the material support statute, 18 U.S.C. § 2339B, that carry statutory mandatory minimum sentences significantly less than life imprisonment (15 or 20 years in the case of § 2339B, depending on when the conduct occurred), which necessarily led to sentences far below the Guidelines sentence applicable in this case. Here, by contrast, because this case involves charges stemming from the thwarted NYC Attack, such as conspiracy to use weapons of mass destruction (18 U.S.C. § 2332a) and conspiracy to bomb a place of public use and public transportation system (18 U.S.C. § 2332f), El Bahnasawy

faces a maximum sentence of life imprisonment.  Accordingly, the cases cited above involving thwarted or unsuccessful terrorist attack plots—and not the 13.6-year average sentence reported by the GW Tracker across all ISIS-related cases—provide the relevant benchmarks here.

The *Jabarah* case cited above is particularly instructive.  The parallels between *Jabarah* and this case are striking.  *See* Ex. B (Gov't Sentencing Mem., *United States* v. *Jabarah*, 02 Cr. 1560 (BSJ), May 7, 2007); Ex. C (Sentencing Tr., *United States* v. *Jabarah*, 02 Cr. 1560 (BSJ), Jan. 18, 2008).  In *Jabarah*, much as in this case: the defendant, Mohammed Mansour Jabarah ("Jabarah"), a Canadian citizen, plotted to carry out a bombing targeting Americans (U.S. embassies in Singapore and the Philippines) on behalf of a foreign terrorist organization (al Qaeda), *see* Ex. B at 1-2; Jabarah was about 19 years old when he participated in the attack plot, *see* Ex. C at 60; the plot was thwarted in the planning phase when Jabarah and certain co-conspirators were arrested, *see* Ex. B at 2; ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

[REDACTED] Jabarah's terrorism crimes resulted in a Guidelines imprisonment range of life, based on an offense level of 43, and he was subject to a mandatory minimum term of imprisonment of only five years (which he had served by the time of sentencing), *see* Ex. C at 6; and, in connection with sentencing, Jabarah claimed that he had been "brainwashed" by extremists, that he had renounced his support for al Qaeda and terrorist ideology during the period of his incarceration, and that he would not pose a threat to society if released, *see id.* at 53, 59.

At sentencing, the district court, after carefully considering the circumstances of the case and the Section 3553(a) factors, imposed a sentence of life imprisonment. *See id.* at 60-67. In the course of setting forth the reasons underlying the sentence imposed, the court found the fact that Jabarah, like El Bahnasawy, was a teenager when he began plotting to kill Americans was not a mitigating factor in light of the gravity of the offense. *See id.* at 65 ("[E]ven a 19- or 20-year-old who would make the decision to go ahead and try to kill innocent people at an embassy has gone beyond that sort of an argument for mitigation. . . . [T]hat is a decision that . . . cannot be mitigated . . . by the fact that you were duped into believing somehow that killing innocent people could be right.").

████████████████████████████████████████████████████

████████████████████████████████   ████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████   Ultimately,

the court found that, regardless of Jabarah's self-serving claim of reformation, the extreme

seriousness of his conduct warranted a life sentence. *See id.* at 60, 62 (stating that the court

"must deal with the acts that you committed, and they are among the most serious types of

criminal conduct that one can imagine, to conspire to and make every attempt to murder

individuals at these embassies," and emphasizing that if Jabarah's attack plotting had not been

thwarted, it was possible that "many people would have been hurt, if not killed").

As is apparent from the foregoing discussion, many of these same circumstances, and

considerations, are present here.  The result should be no different.  El Bahnasawy should be

sentenced to life imprisonment.

Notwithstanding the nature of El Bahnasawy's offense and the other considerations

discussed above, the defense asks the Court to impose a term of imprisonment of only a few

years.  Def. Mem. at 27 ("no more than the years until the onset of Abdulrahman's mid-

twenties").  That request is utterly divorced from the reality of this case and, simply put,

offensive—offensive to basic notions of justice in light of El Bahnasawy's conduct and offensive

to the people whom he sought to kill.

65

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence El Bahnasawy to life imprisonment—the sentence called for by the Guidelines—as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).[10]

Dated:  New York, New York
        March 9, 2018

                                Respectfully submitted,

                                GEOFFREY S. BERMAN
                                United States Attorney for the
                                Southern District of New York

                        By:     _____/s/_____
                                Negar Tekeei / George D. Turner
                                Assistant United States Attorneys
                                212-637-2482 / 2562

---

[10] The Government respectfully submits that the sentence should be apportioned as follows, in accordance with the applicable statutory maximum penalties and consistent with the Probation Office's recommendation, *see* PSR at 21: life imprisonment on each of Counts One, Two, and Three; 15 years' imprisonment on each of Counts Four and Five; and 20 years' imprisonment for each of Counts Six and Seven, with all terms of imprisonment to run concurrently.