*International Prison Transfer Program*

*USA v. El Bahnasawy*
*16 cr 376*
*11/15/18*
*Court Exhibit A*

# HOW THE PROGRAM WORKS

The International Prisoner Transfer Program began in 1977 after Congress passed enabling legislation (18 U.S.C. §§4100-4115) and the Federal Government negotiated the first in a series of treaties to permit the transfer of prisoners from countries in which they had been convicted and sentenced of crimes to their home countries. After transfer, the home or receiving country assumes responsibility for administering the transferred sentence. In addition to foreign national prisoners in federal custody and Americans sentenced abroad, foreign national prisoners in state custody are also eligible to participate in the program. Congress conferred the power to administer the transfer program on the U.S. Attorney General. The Attorney General has delegated this authority to the Criminal Division and to its Office of International Affairs (OIA). Within OIA, the International Prisoner Transfer Unit (IPTU) oversees the daily administration of the program.

Although either the prisoner or the prisoner's country can initiate the transfer process, most applications begin with the prisoner. A federal prisoner who wishes to apply for transfer to a prison in his home country should contact his case manager at the Federal Bureau of Prisons (BOP) facility where he has been designated to serve his sentence and request to execute a BOP Form 297. If the prisoner expresses an interest to transfer on this form, the case manager will prepare a transfer application package. Thereafter, BOP will send the transfer application package to the IPTU where it will be processed and a decision to approve or deny the transfer will be made. (See Guidelines for Evaluating Transfer Requests.) The DOJ will notify the prisoner and the prisoner's home country of its transfer decision. If the transfer is denied, the prisoner may reapply in two years from the date of denial or seek reconsideration in the interim if significant evidence is provided demonstrating that the identified impediment to transfer has been removed. If DOJ approves the transfer, the prisoner's home country must also review the prisoner's transfer request and make a decision whether to approve the transfer. Once both countries approve, the inmate must formally consent to the transfer at a consent verification hearing. (See Post Approval Procedures.)

A foreign national prisoner who is in state custody must follow the transfer application procedure required by the state which sentenced him. In order for a state prisoner to obtain a transfer to his home country, his application must be approved at both the state and federal levels. If the state denies the transfer request, it cannot be reviewed by DOJ. When the state approves the transfer, the application is then forwarded to DOJ for consideration. If DOJ approves the transfer, it will send an approval package to the foreign government. Should the foreign government approve the transfer, a consent verification hearing will be held as with all federal prisoners.

Americans incarcerated abroad wishing to transfer to a prison in the United States must apply for transfer with the government of the country in which they are incarcerated, either directly or through the American Embassy in that country. They must also submit an application to the Department of Justice. A consular official will assist in assembling the application package. Information about the application process for Americans seeking a transfer to the United States can be found at the Americans Incarcerated Abroad (PDF).

*Updated August 31, 2018*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/15/18

Was this page helpful?
Yes   No

# GUIDELINES FOR THE EVALUATION OF TRANSFER REQUESTS SUBMITTED BY FOREIGN NATIONALS

## I - INTRODUCTION

These guidelines explain the criteria used by the Department of Justice (Department) to evaluate a request by a foreign national prisoner to transfer to his home country to serve a sentence imposed in the United States.

The Department considers and weighs many factors to determine whether to approve the transfer request of a prisoner. The primary objective of the international prisoner transfer program is to facilitate the rehabilitation of the prisoner so that he may be a productive member of society in his home country upon release from incarceration. The prisoner transfer program is premised on the universal understanding that a prisoner has the best chance of being successfully rehabilitated and reintegrated into a society where a support system exists to assist the prisoner's adjustment to life after incarceration. Although rehabilitative interests weigh significantly in the transfer determination, law enforcement interests, humanitarian concerns, international cooperation, and specific treaty requirements are also relevant and are carefully evaluated.

The Department evaluates two categories of foreign national prisoner transfer applications. The first consists of foreign national prisoners who have been convicted and sentenced in federal courts and are serving their sentences in the custody of the Federal Bureau of Prisons (BOP). The second category consists of foreign national prisoners who have been convicted in a state court, and are serving their sentences in state prisons. In these cases, the sentencing state must first consent to the transfer before the Department can consider the application. Transfer cannot occur for state or federal prisoners unless the Department, the prisoner, and the receiving country consent. Transfer requests from state prisoners are addressed separately, in Section IV.

- top -

## II - STATUTORY AND TREATY REQUIREMENTS FOR TRANSFER

The United States can only transfer a prisoner to a country with which it has a prisoner transfer treaty relationship. The bilateral treaties and multilateral conventions acceded to by the United States, as well as federal implementing legislation, impose basic requirements that must be satisfied for a transfer to occur. These basic requirements include: (1) the prisoner must be a national of the country to which he or she is seeking transfer; (2) the offense of conviction must also be a crime in the receiving country (dual criminality); (3) the judgment and sentence must be final; (4) there can be no pending appeals or collateral attacks on the judgment or sentence; (5) the sentencing country, the receiving country, and the prisoner must all consent to the transfer; and (6) a minimum period of time (typically six months) must remain to be served on the prisoner's sentence at the time that the application is submitted to ensure that there is sufficient time to complete the transfer and that the transfer will achieve the goals of re-integration into the society of the receiving country.

Some bilateral and multilateral treaties impose additional requirements that must be satisfied before a transfer can occur. Among the more significant requirements that could impact a transfer determination are:

1. The prisoner has not become a domiciliary of the sentencing country. See discussion at IIIA1, supra.

2. The sentence cannot be a capital sentence. A few bilateral treaties and the Organization of American States Convention specifically make prisoners who have been sentenced to death ineligible for transfer.

3. The duration of the sentence must be determinate. Some bilateral treaties (Mexico, Canada, and Thailand) require that a transferred sentence be determinate. The Mexican treaty requires that the transferring sentence have a "specified duration or [that] such a duration has subsequently been fixed by the appropriate administrative authorities." This requirement is especially relevant to prisoners serving life sentences in the United States, since such sentences are inherently indeterminate. A Mexican national sentenced in the United States to a term of life imprisonment must have his sentence commuted to a definite term of years by appropriate United States federal or state judicial authorities. The Canadian and Thai treaties require that the transferring sentence have a "definite termination date, or the authorities authorized to fix such a date have so acted," but specifically allow for the transfer of a life sentence, a juvenile sentence, and, in the case of the Canadian treaty, "indefinite confinement as a dangerous or habitual offender."

4. The offense to be transferred cannot be an immigration offense. The bilateral treaty with Mexico prohibits the transfer of a prisoner convicted of an immigration offense. If the prisoner has been convicted of both an immigration offense and other transferable offenses, the prisoner will be eligible for transfer if, based on the terms of his sentence, he has already served the immigration portion of his sentence. Although the Canadian bilateral treaty contains a similar provision, Canada is also party to the COE and OAS Conventions, which do not contain such a bar, and Canada is willing to use those agreements for the transfer if a Canadian national has committed an immigration offense and applied for transfer.

5. The offense to be transferred cannot be a military or political offense. Some treaties prohibit the transfer of a military or political offense.

- top -

## III - PROCESSING OF FOREIGN NATIONAL PRISONERS IN FEDERAL CUSTODY

BOP is responsible, in the first instance, for determining if a prisoner is eligible to apply for transfer. To be eligible, the prisoner must satisfy certain basic requirements: (1) the prisoner is from a country with which the United States has a transfer treaty relationship; (2) sufficient time remains on the sentence as specified by the applicable treaty; and (3) with respect to Mexican applicants, the offense sought to be transferred cannot be an immigration offense unless there are multiple offenses and the sentence on the immigration offense has been satisfied. BOP forwards applications from eligible prisoners to the Office of International Affairs (OIA), in the Criminal Division of the Department, which determines, based on the criteria set forth below, whether the applicant is a suitable candidate for transfer.

OIA carefully analyzes and considers all pertinent information presented in the transfer application to assess: (1) the fulfillment of the applicable treaty requirements (see section II supra); (2) the likelihood of social rehabilitation of the prisoner, if transferred; (3) law enforcement needs, interests, and concerns; and (4) any compelling humanitarian concerns that directly impact the prisoner.

A. **Likelihood of social rehabilitation**

The central rationale for transferring a foreign prisoner is to facilitate the prisoner's social rehabilitation and reintegration into the society and culture of the receiving country. A prisoner's rehabilitation is more likely to occur when he is serving his sentence in a location where he can have personal contact with friends and family, and where the culture and language are familiar to him. Rehabilitation is expressly stated as an overriding objective in the preambles to most of the prisoner transfer treaties.

The Department examines a number of factors in evaluating whether transfer will further the goal of social rehabilitation. The weight of each factor is determined by the unique circumstances present in each case. The factors are as follows:

1. Strength of Contacts with the Sending and Receiving Countries_____

a. <u>Location of family and other social ties</u>. The prisoner's access to family members and other social ties is a critical factor in assessing the prisoner's potential for social rehabilitation. Social rehabilitation is most likely to occur when the prisoner is near family who can visit him. The prisoner also benefits from other strong connections, including cultural and religious ties, which foster stability and enhance rehabilitation. When the prisoner has strong family ties in the receiving country, it is far more likely that he will remain there to continue those relationships upon his release from incarceration.

In contrast, if the prisoner's family and extended social network are located in the United States, the prisoner, if transferred, will not realize the rehabilitative benefits of being near family and friends and, in some situations, may attempt to return to the United States following his release from incarceration--thereby negating any anticipated social rehabilitative benefits generated by the prisoner's transfer.

b. <u>Length of time spent in receiving country and in the United States</u>. In assessing the strength of the prisoner's relationship with the receiving country, the Department considers the length of time he has spent in the United States and in the receiving country. The longer the period of time and the more recent its occurrence, the more probative it may be of the prisoner's connection to the country at issue. Sometimes, <u>the length of time that a prisoner has spent in the United States and the quality of connections he has established to the United States are so strong that the prisoner has become a domiciliary of the United States</u>. When the facts demonstrate that the prisoner has become a domiciliary of the United States, the Department will usually deny transfer, reasoning that the prisoner has effectively become a member of society in the United States with a strong familial and social support network here to facilitate his/her rehabilitation.[2]

c. <u>Employment history, education history and property ownership</u>. A prisoner's education and employment history can provide valuable insight about his connections to the United States and the receiving country. The significance of these contacts is influenced by their duration and recency. The prisoner's ownership of significant assets in the United States, such as a business, a home, or other real property establishes an additional link to the United States.

2. <u>Deportation/removal history and frequency and timing of returns</u>. Recent deportations, exclusions, voluntary returns, or numerous illegal entries into the United States, may negatively impact the transfer decision because these factors may be probative of the strength of the prisoner's connection with and desire to be in the United States. In general, the greater the number of these occurrences, the stronger the inference that the prisoner will seek to return to the United States if he is transferred. The timing of past illegal reentries is also important. An illegal reentry into the United States soon after a removal is more significant than an illegal entry that occurred years after a removal. Committing a criminal offense soon after illegal reentry also weighs against transfer. A transfer to the receiving country under circumstances

strongly suggesting the prisoner's intent to return to the United States upon completion of his sentence undermines the integrity of, and is contrary to, the rehabilitative goals of the transfer program.

3. <u>Acceptance of responsibility</u>. The prisoner's acceptance of responsibility is another factor that may be considered in assessing the prisoner's potential for rehabilitation. Acceptance of responsibility may be demonstrated in a number of ways, including cooperating with the authorities, providing complete and candid information about the prisoner's involvement in the offense, testifying at trial or before a grand jury, and/or entering a timely guilty plea.

4. <u>Criminal History</u>. The number and types of crimes committed, the role of the prisoner in these offenses, and the nature of harm caused may also be important predictors of the prisoner's rehabilitative potential. Reoffending or committing criminal conduct while on probation or parole are strong indicators of a prisoner's inability or unwillingness to refrain from future criminal behavior, one of the main goals of rehabilitation.

5. <u>Seriousness of the offense</u>. The seriousness of the offense, a critical factor in any sentencing decision, is important in evaluating whether serving all or most of the sentence in the United States will further the prisoner's rehabilitation more than transferring the prisoner to the receiving country. Facts about the criminal conduct frequently provide information about the rehabilitative potential of the prisoner and his likelihood of reintegrating into the society of the receiving country.

In assessing the seriousness of the underlying criminal conduct, the Department considers: the amount of pecuniary loss; the number of victims and the nature of any physical, financial or psychological harm to them; harm to the public; whether the conviction was a crime of violence, with special emphasis on the use of weapons, or the disregard for human life and safety; whether the prisoner had direct ties or involvement with gangs, terrorist organizations and other organized criminal groups; the role of the prisoner in the offense; and the level of planning and preparation involved in the commission of the crime.

6. <u>Criminal ties to the receiving country</u>. If a prisoner maintains continuing ties to criminal activity or organizations in the receiving country, transferring the prisoner could facilitate reintegration into the prisoner's former criminal milieu, rather than promote the prisoner's rehabilitation and reentry into civil society. Evaluation of this factor might include the following considerations: whether the prisoner is a member of a gang, drug cartel or other organized criminal group, and if so, his role in that organization; the strength of the evidence that the criminal ties remain active during the prisoner's incarceration; and the period of time since the prisoner has had contact with these criminal elements.

7. <u>Conduct of the prisoner while incarcerated</u>. A prisoner's conduct while incarcerated and compliance with prison rules are also predictive of the rehabilitative potential of the prisoner. Serious infractions, especially those involving violence, drugs, weapons, and attempts to escape weigh against transfer, especially when the prisoner commits a large number of such infractions and his pattern of misbehavior appears to be undeterred by punishment.

8. <u>Prisoner has received a prior prisoner transfer</u>. When a prisoner has been previously transferred and then re-enters the United States and reoffends, it is Department policy not to approve a second transfer absent exceptional circumstances. In such a situation, the prisoner has been given an opportunity to rehabilitate but has elected not to do so. His actions reflect minimal chance for rehabilitation and, in some cases, may also show a desire to be in the United States rather than the receiving country.

9. <u>Prisoner is a dual national</u>. When a prisoner is a dual national of both the United States and the receiving country, the transfer decision must be based upon a determination of whether the prisoner's ties with the receiving country are stronger than his ties to the United States, and an evaluation of whether the

rehabilitative objectives of the international prisoner transfer program will be better served by a transfer to the receiving country.

### B. Law enforcement needs, interests, and concerns

In making its transfer decision, the Department also considers law enforcement concerns and the interests of justice, which, in some situations, may take precedence over the goal of the prisoner's social rehabilitation. The following law enforcement concerns are evaluated in the context of the prisoner's transfer application:

1. Seriousness of the offense. See discussion at IIIA5, supra. The more serious the offense and the more severe the impact on any victims, the greater the interest may become in having the prisoner serve his sentence in the jurisdiction where the offense was committed.

2. Law enforcement and prosecutorial needs and concerns in the United States. Law enforcement interests that may be pertinent to the transfer decision include, but are not limited to, whether:

a. the prisoner's testimony or cooperation is needed against codefendants, in an ongoing investigation, before a grand jury or in a criminal trial;

b. the prisoner has pending charges, detainers or other open cases, or investigations;

c. law enforcement agents in the United States require further debriefing of the prisoner;

d. the prisoner has unpaid restitution. Before a prisoner with outstanding restitution is transferred, the Department considers carefully the impact to the victims. The existence of court-ordered restitution is not a bar to transfer; however, the Department will consider unpaid restitution in evaluating the transfer request.

3. Law enforcement interests of the receiving country. When the United States transfers a prisoner, the receiving country receives valuable law enforcement information about the prisoner. In addition to knowing that the prisoner is within its jurisdiction, transfer provides the country with the opportunity to exercise control over the prisoner for a period of time, to learn the details about the offense the prisoner committed, and to be informed of important information about the prisoner's criminal background, associations and behavior in prison, and the existence of any behavioral or mental issues. All of this information assists the country in its efforts to rehabilitate the prisoner and safely reintegrate him into society. Such information is also particularly important when the prisoner has committed a serious crime and the risk exists that the criminal behavior might be repeated in the receiving country upon release. In such situations, transfer provides a country with the opportunity to avail itself of available monitoring and treatment options.

4. Public policy. In rare situations, transfer might be denied if the return of the prisoner to a foreign country would be contrary to the public policy of the United States. For example, transfer might be denied if the receiving country is in a state of political upheaval that would jeopardize the safety of returning prisoners; or if the transfer of the prisoner would compromise the national security or significant interests of the United States.

5. Renewed criminal activity in the receiving country. See discussion at IIIA6, supra. When available information indicates that the prisoner's ties to criminal elements in the receiving country remain significantly intact so that it is reasonable to predict that the prisoner's return to the receiving country would simply facilitate a resumption of serious criminal activity, the Department will weigh this factor against transfer.

6. Possible sentencing disparity. When a prisoner is transferred, responsibility for administering his sentence belongs exclusively to the receiving country. Under most treaties, the receiving country assumes

responsibility for the execution of the transferred sentence, which is carried out under the laws and regulations of the receiving country, including any provisions for reduction of the term of confinement. Under a few treaties, the receiving country has the additional option of converting the sending country's sentence through either a judicial or administrative procedure into its own sentence, essentially substituting a penalty for a similar offense under its own laws. Regardless of whether the sentence is continued or converted, the receiving country is responsible for administering it. The Department accepts the fact that not all transferred sentences will be enforced exactly as they would have been had the prisoner remained incarcerated in the United States. In the vast number of cases, sentence disparity should have no impact on the transfer determination. However, occasionally, when the case is extremely serious or critical national security or law enforcement interests are implicated, the Department will consider potential disparity in sentences in making the transfer determination.

### C. Humanitarian concerns

Occasionally, the Department may transfer a prisoner who would not otherwise be a suitable candidate for transfer because humanitarian concerns exist, for example, if the prisoner is suffering from a terminal illness. In other circumstances, humanitarian concerns are weighed as yet one factor to consider in the transfer determination (for example, the grave illness of a close family member). Illnesses for which the prisoner is being or could be treated in the United States, or the advanced age of a parent, absent other circumstances, do not typically justify a transfer on humanitarian grounds.

- top -

## IV - FOREIGN NATIONAL PRISONERS IN STATE CUSTODY

All states have enacted legislation permitting them to participate in the International Prisoner Transfer program. When a foreign national prisoner has been convicted of a criminal violation of a state law and is in state custody, the prisoner must first obtain the approval of the state authorities before he can be considered for transfer by the Federal Government. Each state has its own application process and procedures, which a prisoner must follow. If a state denies a transfer request, the transfer cannot occur. The Federal Government cannot compel a state to transfer a foreign national.

If the state approves the transfer, it transmits the case to the Department for review. Unless a treaty requirement has not been satisfied or a compelling federal interest is presented by the case, the Department generally defers to a state's transfer decision, believing that the states are best equipped to assess if transfer would be consistent with state policy and the rights of any victims impacted by the crime.

The most common basis for the Department to deny the transfer of a state prisoner typically occurs when a prisoner has not satisfied a treaty requirement (e.g., a Mexican national has become a domiciliary of the United States or the state has imposed an indeterminate sentence that cannot be satisfied under the terms of a treaty). On occasion, the Department may also deny the transfer of a state prisoner based on law enforcement, national security, or public safety concerns.

- top -

[1] These guidelines do not constitute formal standards or regulations. Nor do they create or impose any legal requirements or mandates on the federal government or create or confer any legal rights for, or on, any individual.

[2] The bilateral treaties of Mexico, Turkey and Panama have specific domiciliary clauses, which expressly prohibit the transfer of prisoners who have become domiciliaries of the sending country, even though the prisoners are nationals of the receiving country. For example, the domiciliary clause of the Mexican treaty, found in Article II(3), defines a domiciliary as "a person who has resided in the sentencing country for at least five years with the intent to remain in that country."

*Updated August 31, 2018*

Was this page helpful?
Yes    No