**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
and Attorney-in-Chief

Southern District of New York
*Jennifer L. Brown*
Attorney-in-Charge

September 26, 2018

**BY HAND DELIVERY**

Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    **United States v. Abdulrahman El Bahnasawy,
                16 Cr. 376 (RMB)**

Dear Judge Berman:

      We write in reply to the government's sentencing memorandum, which asks the Court to impose a sentence of life imprisonment on Abdulrahman El Bahnasawy, a now-20-year-old, mentally ill young person who has no prior criminal history and did not injure anyone. The defense does not—and has never—disputed the seriousness of Mr. El Bahnasawy's conduct nor attempted to "create an excuse" for it. Contra Gov't Mem. at 42. Rather, the defense's request for a parsimonious sentence is firmly rooted in "the history and characteristics of the defendant," "the nature and circumstances of the offense," and the needs for punishment, deterrence, public safety, and rehabilitation. See 18 U.S.C. § 3553(a)(1)–(2).

      In its submission, the government overstates Mr. El Bahnasawy's dangerousness and understates the significant mitigation and rational hope for rehabilitation in his case. He is no longer obsessed with ISIS but continues to struggle with addiction and mental illness. Abdulrahman El Bahnasawy is redeemable; his conditions are treatable. He is not Mohamed Mansour Jabarah, whose case the government cites, by a long shot.

**1.    Mr. El Bahnasawy's substantial mental health and addiction issues warrant a downward departure under U.S.S.G. § 5H1.3.**

      So substantial and mitigating are Mr. El Bahnasawy's mental health and addiction issues that this Court should grant a formal departure pursuant to U.S.S.G. § 5H1.3. As revised effective November 1, 2010, this section now provides that "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other

offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." § 5H1.3.  In 2010, the Sentencing Commission specifically reversed prior language which had stated that such conditions "are not ordinarily relevant in determining whether a departure is warranted." It now further provides that, in certain cases, "a downward departure may be appropriate to accomplish a specific treatment purpose." Id. "The Commission adopted this [new] departure standard after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." Amendments to the Sentencing Guidelines at 10 (May 3, 2010), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20100503_RFP_Amendments_0.pdf. Mr. El Bahnasawy's mental health issues and addiction are unusually severe—nearly unique—and they contributed to his offense conduct.  Accordingly, this Court should depart from the Guidelines under § 5H1.3.



In an update letter dated September 21, 2018, Dr. Mariani and Dr. Porterfield reconfirm their prior diagnoses and opinions. See **Exhibit A** (Mariani Supplemental Letter).

and a desire to find community. Online relationships became Mr. El Bahnasawy's obsession, and his ISIS contacts—including the undercover agent—became his community. Id. He also imbibed ISIS propaganda that touted an inaccurate image

Honorable Richard M. Berman  September 26, 2018
United States District Judge  Page 3 of 13

of a government committed to "public-works projects and economic development."[1] To suggest that Mr. El Bahnasawy's mental illness did not affect his actions, contrary to three clinical impressions, all because its manifestations are not what the government might have expected, is simply wrong. Mr. El Bahnasawy's lapse in medication and mental illness give mitigating context the Court should consider.



---

[1] See Brendon Koerner, *Why ISIS Is Winning the Social Media War*, Wired (April 2016).

Honorable Richard M. Berman                                September 26, 2018
United States District Judge                                      Page 4 of 13

At every turn, the government attempts to transform Mr. El Bahnasawy's mitigating personal history and characteristics—his youth, the almost unique extent of his psychological and addiction issues—into aggravating sentencing factors. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ "The frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009.[2] Treatable and temporary factors that influenced Mr. El Bahnasawy's offense are, by definition, mitigating.

Finally, the government takes great umbrage at the suggestion in the initial defense sentencing memorandum that U.S. law enforcement may have been aware, prior to Mr. El Bahnasawy's arrest, that he had been treated at Canada's Centre for Addiction and Mental Health ("CAMH"). Gov't Mem. at 39 (citing Def. Mem. at 4). But there is clear documentary support in the discovery for this position. In a written chat on May 12, 2016, Mr. El Bahnasawy mentioned to the undercover agent that he had been in "rehab." The Royal Canadian Mounted Police requested Mr. El Bahnasawy's CAMH records four days later, on May 16, 2016.  Def. Mem., Ex. X.

2.  **Mr. El Bahnasawy is a first-time offender with zero criminal history points; a downward departure is warranted under U.S.S.G. § 4A1.3.**

Mr. El Bahnasawy is a first-time offender.  He has zero criminal history points.  But by operation of the terrorism guideline, U.S.S.G. § 3A1.4(b), his criminal history category is artificially elevated from I to VI. While the Second Circuit has held that "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b)," the Circuit also noted in the same case that the district court "always has the discretion under § 4A1.3(b) to depart downward in sentencing." United States v. Meskini, 319 F.3d 88, 92 (2d Cir.2003). "Thus, even where the terrorism enhancement applies, a horizontal departure on criminal history is warranted under § 4A1.3(b) if a criminal history category of VI substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." United States v. Aref, No. 04 Cr. 402, 2007

---

[2] Available at the U.S. Nat'l Library of Medicine, Nat'l Inst. of Health, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf

WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007) (downwardly departing from category VI to category I).

This Court should grant a downward departure under U.S.S.G. § 4A1.3(b) because category VI "substantially over-represents the seriousness of [Mr. El Bahnasawy's] criminal history." § 4A1.3. Mr. El Bahnasawy is a first-time offender with zero criminal history points, not a career criminal.

Empirical study by the U.S. Sentencing Commission indicates that Mr. El Bahnasawy's criminal history score—zero—reliably indicates a low risk of recidivism. See U.S. Sentencing Commission, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18, App'x A-1 (2016) ("2016 Recidivism Report")[3] "30.2 percent of offenders with zero total criminal history points were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points." Id. at 18. For background, the overall 8-year rearrest rate across all federal offenders was 49.3%. Id. at 5.

The government has argued that the "high recidivism rates" and the "notoriously difficult" task of rehabilitating "terrorists like Mr. El Bahnasawy" are reasons to imprison Mr. El Bahnasawy for life. Gov't Mem. at 54–55. But, unlike the Commission's scoring of criminal history points, the government's argument has no empirical basis. The government seeks support in Meskini, 319 F.3d 88, but that case merely rejected a due-process challenge to the terrorism guideline, U.S.S.G. § 3A1.4, under highly deferential *rational basis* review. Neither the court in Meskini nor the government here has adduced any statistical analysis or other support for the government's claims concerning recidivism, rehabilitation, and deterrence in terrorism cases. The defense is unaware of any comprehensive study of recidivism rates in federal terrorism cases. But a 2016 recidivism study on Guantanamo releases is informative. In total, only 17.6% of released detainees were "confirmed of reengaging."[4]

In Aref, the defendant Mohammed Mosharref Hossain was convicted at trial of all 27 counts against him, including one count of conspiracy to provide material support to a terrorist organization and seven counts of attempted to provide material support to a terrorist organization, all in violation of 18 U.S.C. § 2339B. These convictions arose from a long conspiracy to fund terrorist organizations overseas and to import a surface-to-air missile into the United States for the purpose of carrying out a terrorist attack on U.S. soil. See Aref, 2007 WL 804814, at *1. Notwithstanding the nature and extent of the conspiracy, the number of

---

[3] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

[4] See https://constitutionproject.org/wp-content/uploads/2015/02/TCP-GTMO-Recidivism-Analysis-9-4.pdf

convictions, and the extensive planning involved to carry out these crimes, the court determined that "a criminal history category of VI does substantially over-represent the seriousness of Hossain's criminal history." Id. at 3. In light of Hossain's criminal history score of zero, the court departed to category I, and imposed a total sentence of 15 years. Id. at *3, 8. See also, e.g., United States v. Joseph Hassan Farrokh, 16 Cr. 20 (E.D. Va. 2016) (where defendant attempted to join ISIS in Syria, departing under § 4A1.3 and imposing a below-guidelines sentence of 102 months).

Here, as in Aref, category VI substantially over-represents the seriousness—even the existence—of Mr. El Bahnsaway's criminal history. A downward departure is warranted under § 4A1.3(b).

### 3. Mr. El Bahnasawy was not an "operational terrorist;" the Court should not ignore the role of the undercover agent.

With no criminal history, but isolated and mentally ill, Mr. El Bahnasawy sought community online and fell under the spell of three individuals—ISIS recruiter Abu Issa al-Amriki, the undercover agent with whom he planned the attack on New York, and "PERSON 2," who was also either law enforcement or acting at the direction of law enforcement.

While Mr. El Bahnasawy helped plan the attack and sent money and supplies to the undercover agent, he was never an "operational terrorist." Contra Gov't Mem. at 38. To describe him as the "driving force and operational planner" of the attack, id. at 30, wrongly neglects the crucial role of government agents.

Mr. El Bahnasawy's chats with the undercover make clear that the agent was to provide weapons training—Mr. El Bahnasawy had none—to receive supplies within the United States, and to provide transportation to where they would prepare for an attack. Without the agent, there could have been no attack. It is thus untrue to argue that Mr. El Bahnasawy was operational for an attack on New York City.

So important was the undercover agent that, on four separate occasions, Mr. El Bahnasawy referred to the undercover as the "ameer," or leader, of the plot. Mr. Bahnasawy even once called the undercover "my ameer," indicating that he viewed the agent as his direct superior. Mr. El Bahnasawy considered the undercover to be the leader of the plot. Indeed, his first message to the undercover was "I'm one of the guys from the US project, PERSON 2 linked me to u[.] He said that when he leaves for 2 weeks u can take care of me[.]"

Mr. El Bahnsawy wrote that understood PERSON 2 to be "our main ameer." The government has not denied that PERSON 2, also, was either a law-enforcement

agent or acting at the direction of law enforcement. The role of PERSON 2 and the undercover in feeding Mr. El Bahnasawy's hunger to belong and reinforcing his worst ideas cannot be overlooked.

    We address for now the communications that were produced in Rule 16 discovery, those between Mr. El Bahnasawy and the disclosed undercover agent. It is fair to say that these messages contain some of the most disturbing elements of this case, including Mr. El Bahnasawy's professed aspiration to create the next 9/11 and a subway map indicating where he and the undercover would detonate bombs. But the Court cannot overlook the context of these messages: Mr. El Bahnasawy and the agent wrote inflammatory messages to one another to avoid suspicion and convince each other that they could be trusted. While the undercover's violent and encouraging comments to Mr. El Bahnasawy no doubt advanced law-enforcement objectives, they also contributed to Mr. El Bahnasawy's radicalization. Examples of *the undercover agent's* statements to Mr. El Bahnasawy include the following:

- April 30, 2016: "So just imag[ine], plane gets blown out of the sky. Imagine the psychological effect on the kufaar … And that's just the start … And then we launch multiple attacks when the kufaar are still dazed from blowing the plane out of the sky."

- April 30, 2016: "They must pay … Pay jiziya or pay with their blood … Akhi I know more than you'll believe … Lets just say I know firsthand. They are at war with us."

- May 1, 2016: "Good tactics plus small bombs are more deadly than one big bomb not used well. We can do better than boston."

- May 1, 2016: "This will be bigger than 9/11 [Inshallah]."

- May 1, 2016: "…They've been bombing us for decades. They need to feel the wrath. We have the blessed position to strike them from within. How many mujahedeen wish that they could do what we will do?!"

- May 7, 2016: "One bomb will have the effect of one thousand soldiers! … The cops bullet proof vests will melt to their kufaar bodies and they won't be able to stop us! ... They can't out run a bomb!"

- May 19, 2016: "…Nasheeds all the way to nyc. I would rip those buildings down with my bare hands if I could n set the whole city on fire. Let it [burn]."

In addition, the agent continually stoked Mr. El Bahnasawy's sense of belonging and encouraged Mr. El Bahnasawy to send him money for the attack and finding additional recruits.

Honorable Richard M. Berman  September 26, 2018
United States District Judge  Page 8 of 13

The initial defense submission rightly wonders whether, "absent encouragement online"—including the encouragement of Abu Issa al-Amriki as well as of PERSON 2 and the undercover agent—Mr. El Bahnasawy would have planned to follow through with an attack. <u>See</u> Def. Mem. at 10. The government irresponsibly takes this assertion out of context in its submission by suggesting the defense implies that Mr. El Bahnasawy would have independently lost interest, ignoring the qualifier "absent encouragement online." <u>See</u> Gov't Mem. at 36. The encouragement that Mr. El Bahnasawy found online is particularly important in light of his social isolation during the offense conduct. Having been isolated in school for his inability to fit in and later cordoned off from his community in drug treatment, Mr. El Bahnasawy searched for friends, role models, and anyone who would make him feel like he belonged. The undercover agent helped to filled this void—by complimenting Mr. El Bahnasawy's "creativity," calling him a "valuable brother," and by simply being willing to talk. Mr. El Bahnasawy looked up to the agent. As important to him as the jihad was the agent's feigned friendship. Mr. El Bahnasawy asked the agent to arrange for them to be on the same "team" for an attack. He wrote: "I wanna do it with u . . . It's less scary that way too lol." In his supplemental letter, Mr. El Bahnasawy explains how undercover agents (and an ISIS recruiter) deepened his radicalization and contributed to his decision to help plan an attack. <u>See</u> Ex. C at 1 ("I was obsessed with the Islamic State, and they encouraged me in my obsession and told me they thought an attack was a good idea.").

The government aggrandizes Mr. El Bahnasawy's communication methods by calling the applications he used "highly sophisticated, encrypted electronic communications platforms." <u>See</u> Gov't Mem. at 37. These applications, including Telegram and Threema, are available for public download and do not require sophisticated knowledge. In fact, WhatsApp and Facebook Messenger—each used by hundreds of millions of people every month—are also considered encrypted messaging applications.[5] These applications are available for free from official sources for both Apple and Android devices.

Finally, it bears note that Mr. El Bahnasawy's situation is not wholly unique. There are other cases in which the mentally ill defendants—though none of them appears as ill as Mr. El Bahnasawy—were in touch with the same ISIS recruiter, Abu Issa al-Amriki, and conspired with encouraging undercover agents indifferent to their illness:

- In <u>United States v. Mohamed Bailor Jalloh</u>, 16 Cr. 163 (E.D. Va.) (February 10, 2017), the defendant was a 27-year-old former army national guardsman who conspired to murder U.S. military personnel in the United States. In

---

[5] <u>See</u> https://fossbytes.com/best-secure-encrypted-messaging-apps/

preparation for the attack, Jalloh had purchased a handgun and an assault rifle for that purpose. The court sentenced him to 11 years.

- In United States v. Emmanuel Lutchman, 16 Cr. 6071 (W.D.N.Y.), the 26-year-old defendant planned to commit a New Year's Eve attack in Rochester, New York. In preparation for the attack, Lutchman had gone with another person to Wal-Mart and bought black ski masks, knives, a machete, zip ties, duct tape, ammonia, and latex gloves. The court sentenced him to 20 years.

- In United States v. Aaron Daniels, 16 Cr. 222 (S.D. Ohio), the 20-year-old defendant was arrested while trying to board a flight to Libya. In its sentencing memorandum, the government wrote that it would not oppose a below-guidelines sentence of 15–17 years, based in part on a psychological disorder that the government told that court it thought was exaggerated. The court sentenced him to 80 months, i.e., less than 7 years.

**4. The contrast between Mr. El Bahnasawy and Mohamed Mansour Jabarah is stark.**

Rather than acknowledge these analogous Abu Issa-related cases, the government draws an unlikely comparison to between Mr. El Bahnasawy and Mohamed Mansour Jabarah. Gov't Mem. at 63. As the government points out, they were both from Canada, arrested at a young age—though Jabarah was about two years older than Mr. El Bahnasawy—faced terrorism charges ████████████ ████████████. But that is where the similarities end. Jabarah's actions were unmitigated; the same cannot be said for Mr. El Bahnasawy.

Mohamed Mansour Jabarah graduated from terrorist training camps in Afghanistan and Pakistan and swore an oath of loyalty to al Qaeda in the presence of Osama bin Laden. See generally Gov't Mem., Ex. B (Jabarah sentencing memo). Bin Laden personally dispatched Jabarah to perform terrorist operations under the personal direction of Khalid Sheikh Mohammed ("KSM"), the architect of the 9/11 attack. Jabarah stayed with KSM in Karachi, Pakistan, from mid-August to early September 2001, i.e., in the weeks leading up to the 9/11 attack, where he received advanced terrorist training in stealth travel and surveillance techniques. KSM gave Jabarah tens of thousands of dollars in al Qaeda funds to plan attacks on U.S. embassies in the Philippines and Singapore. Jabarah traveled to those countries, coordinated with local terrorist groups on the ground, met with an explosives expert and the suicide driver, conducted video surveillance of target embassies, and purchased many tons of explosive material.



Mr. El Bahnasawy's conduct, while serious, is incomparable to Jabarah's.

Whereas every aspect of Mr. El Bahnasawy's case is informed by mitigating factors, Jabarah's conduct was unmitigated. Other than the self-serving claim to have been "brainwashed" by al Qaeda operatives and his stated ambitions of returning to college and attending medical school, little stands out other than perhaps his age (he was 25 at sentencing). Mr. El Bahnasawy has faced serious, mitigating obstacles of polysubstance drug addiction, serious mental illness, childhood bullying, and social isolation. Jabarah did not.

5.  **The Court should not credit the government's shaded view of Mr. El Bahnasawy's letter**

The government either misinterprets or distorts when it argues that Mr. El Bahnasawy's letter is a justification for violence because, it writes, "he continues to hold some of the same beliefs that led him down the path of violent jihad, and asks the Court to embrace Islam and see the 'falsehood of the current system.'" Gov't Mem. at 58. Mr. El Bahnasawy's present beliefs are simply religious beliefs held my millions of Muslims who do not engage in violence, and the mental health specialists agree that Mr. El Bahnasawy no longer espouses violence. As Ms. Veasley notes, "Not only does he continue to reject radical ideology, but he is now deeply ashamed that he once viewed Islam as compatible with violence." Ex. B at 1. It is perfectly natural for someone to hold Muslim beliefs, disagree with American foreign policy, and to even try to convince a court of his peaceful beliefs—and not be inclined toward violence. That is what comes through in Mr. El Bahnasawy's first letter to the Court. The most salient characteristic of the letters is their candor. Abdulrahman clarifies his views in his supplemental letter, noting that his comments "had nothing to do with violence." See Ex. C at 2.

Honorable Richard M. Berman				September 26, 2018
United States District Judge				Page 11 of 13



	The defense asks the Court not to credit the government's self-serving characterizations and instead to assess Mr. El Bahnasawy's personality by his letter, his many appearances before Your Honor, and his comments at sentencing.

6.	**The general deterrence value of a long sentence is the same in terrorism context as it is in other contexts: zero.**

	The government cites no authority for its claim that general deterrence is particularly important in terrorism cases. See Gov't Mem. at 59. The truth is that neither party knows how much impact a message from this Court would have on young people bent on jihad (and often prepared to die for it). The Justice Department itself has recognized that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime" and [i]ncreasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Nat'l Inst. of Justice, "Five Things About Deterrence."[6] Given the government's inability to show terrorism cases are different in this respect, the Court should put no weight on general deterrence.

7.	**Given the BOP's inability to address Mr. El Bahnasawy's needs, rehabilitative concerns counsel against a lengthy prison sentence.**



---

[6] Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

Honorable Richard M. Berman                                             September 26, 2018
United States District Judge                                                  Page 12 of 13



There is no reason to believe those obstacles will fade once he is designated. As an initial matter, Mr. El Bahnasawy's psychiatric and social-work team has made his progress possible despite the MCC's shortcomings. Once designated, Mr. El Bahnasawy will no longer have these resources.

To make matters worse, Mr. El Bahnasawy will be ineligible for the drug treatment he most needs due to his lack of immigration status in the United States. He will be barred from the nine-month Residential Drug Abuse Program, as well as the Federal Prison Industries job training program and the reentry-geared Release Preparation Program. And, though he would not be automatically excluded, detained aliens are often prevented from participating in the three-month Nonresidential Drug Abuse Program. See, e.g., Espinoza v. Lindsey, 500 F. App'x 123 (3d Cir. 2012). Most undocumented prisoners are incarcerated in private facilities, which are not required to offer any rehabilitative services. See GAO Report to Subcommittees on Commerce, Justice, and Science, Senate and House Appropriations Committees, "Cost of Prisons," at 15.[7] In light of these established issues, "[r]ehabilitative concerns weigh especially strongly against a term of imprisonment where the defendant is subject to deportation upon completion of a sentence." See United States v. Chong, 2014 WL 4773978, at *9 (E.D.N.Y. Sept. 24, 2014).

A bipartisan task force created by Congress recently reported in January 2016 that cognitive behavioral therapy and mental health treatment is not available in many facilities and that participation was restricted by a lack of resources and staff. See Charles Colson Task Force on Federal Corrections, Transforming Prisons, Restoring Lives: Final Recommendations of the Colson Task

---

[7] Available at https://www.gao.gov/new.items/d086.pdf

Honorable Richard M. Berman  September 26, 2018
United States District Judge  Page 13 of 13

Force on Federal Corrections at 36 (Jan. 2016).[8]  We can expect these deficiencies to become even worse, as the current administration has ordered increased use of private prisons, cut existing staff, programming and reentry services, and has actively sought budget cuts to reduce them even more.

In short, it would be irrational to expect that Mr. El Bahnasawy will receive therapeutic support in BOP custody.  The significant progress that he has made to date is attributable to outside experts and resources that would be available to him in the community but not in a designated BOP facility.

* * * * *

Mr. El Bahnasawy's conduct is serious, but not unmitigated. He was exceptionally vulnerable to ISIS messaging. Isolated, he found a friend in the undercover agent, who praised his worst ideas and was instrumental in bringing them closer to reality. His parents did not intervene.

If there is a terrorism defendant who deserves holistic consideration, it is Abdulrahman El Bahnasawy. He first came before Your Honor as an 18-year-old who had experienced isolation, addiction, and mental illness. Yet he has the potential to lead a normal life, to have a family, and to grow old in peace in Canada.

Abdulrahman El Bahnasawy is not the one-dimensional monster the government depicts him to be. He is an obedient and respectful son, as the Court itself has observed May 4, 2017 Tr. at 2, and a loving brother whose teenage years went terribly wrong. He could have been saved through effective treatment for his severe addiction and mental illnesses—and he still can be redeemed and rehabilitated through such treatment. This Court's sentence should stand on that hope.

Respectfully submitted,

/s/
Sabrina P. Shroff
Clay H. Kaminsky
Assistant Federal Defenders
Federal Defenders of New York
(212) 417-8713 / 8749

cc:   AUSAs Negar Tekeei and George Turner
      Abdulrahman El Bahnasawy

---

[8] Available at https://www.urban.org/sites/default/files/publication/77101/2000589-Transforming-Prisons-Restoring-Lives.pdf.